T.C. Memo. 2017-183

UNITED STATES TAX COURT

KEITH A. TUCKER AND LAURA B. TUCKER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12307-04.                      Filed September 18, 2017.

<u>George M. Clarke III</u>, <u>Robert H. Albaral</u>, <u>David Gerald Glickman</u>, <u>Phillip J.
Taylor</u>, <u>Mireille R. Oldak</u>, <u>Vivek A. Patel</u>, <u>John D. Barlow</u>, and <u>Kathryn E.
Rimpfel</u>, for petitioners.

<u>Donald Kevin Rogers</u>, <u>Charles Buxbaum</u>, <u>Christopher Fisher</u>, and <u>John J.
Boyle</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Respondent issued a notice of deficiency disallowing

petitioners' claimed loss deduction of $39,188,666 for the 2000 tax year.  This

[*2] adjustment resulted in a $15,518,704 deficiency and a $6,206,488 section 6662 penalty.[1]  The claimed loss deduction arises from a series of offsetting foreign currency digital options that petitioner Keith A. Tucker entered into through passthrough entities.  One set of offsetting foreign currency options generated the loss, and a second set of offsetting foreign currency options generated a tax basis in an S corporation through which petitioners claimed the loss deduction.  Through a technical application of statutory and regulatory provisions, Mr. Tucker separated the loss and gain from the offsetting options and claimed only the loss portion as U.S. source.  Before trial petitioners conceded the basis component but continue to assert the deductibility of a $2,024,700 loss for 2000 based upon their purported cash basis in the S corporation.  Petitioners seek to carry forward the remainder of the loss deduction to the extent of stock basis in future years.

On the basis of the concession, the issues for decision are:  (1) whether petitioners are entitled to deduct a loss for 2000 on the offsetting foreign currency options.  We hold that they may not because the underlying option transactions

---

[1]Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code (Code) in effect for the year in issue.

**[\*3]** lacked economic substance; and (2) whether petitioners are liable for an accuracy-related penalty under section 6662. We hold that they are not.

FINDINGS OF FACT

I.    Background

At the time the petition was timely filed, petitioners resided in Texas.[2] Mr. Tucker received a bachelor of business administration degree with a major in accounting and a minor in finance in 1967 and a juris doctor degree in 1970 from the University of Texas. Mr. Tucker was licensed as a certified public accountant (C.P.A.). He never practiced law. After his college graduation and while attending law school, Mr. Tucker worked at KPMG or its predecessor (KPMG) and became a partner in 1975. Mr. Tucker started his KPMG career preparing individual tax returns and then life insurance company returns and eventually began to provide technical advice on life insurance company tax matters. He successfully developed his life insurance tax practice and a national reputation. In 1981 Mr. Tucker became the national director of KPMG's insurance practice. In 1984 Mr. Tucker left the insurance taxation field and joined the investment banking firm Stephens, Inc., as a senior vice president, becoming involved in

---

[2]The parties filed stipulations of facts with accompanying exhibits which are incorporated by this reference.

[*4] mergers, acquisitions, public and private placements, and corporate finance. In 1987 Mr. Tucker joined the private equity firm Trivest, Inc., as a partner, working on middle-market leveraged buyouts. In 1991 Mr. Tucker left Trivest to become an executive at Torchmark Corp., an insurance, financial services, and real estate holding company. In 1992 Mr. Tucker became the chief executive officer (CEO) of a Torchmark subsidiary, Waddell & Reed Financial, Inc. (Waddell & Reed), a national mutual fund and financial services company targeting middle-class individual investors and small businesses. In 1998 Torchmark spun off Waddell & Reed as a publicly traded company. Mr. Tucker remained the CEO and served as a director and the chairman of the board. Mr. Tucker remained in these positions until his forced resignation in 2005. After leaving KPMG in 1984, Mr. Tucker continued to maintain a relationship with the firm. KPMG served as his personal tax adviser and return preparer. KPMG prepared petitioners' returns for 1984 through 2000 and advised Mr. Tucker on various investment, income, and estate planning issues.

### A. Executive Financial Planning Program

After Waddell & Reed went public in 1998, Waddell & Reed established a company-sponsored personal financial planning program for its senior executives (WR executive program) that provided financial, estate, and income tax planning

[*5] and tax return preparation services. Part of Waddell & Reed's reasoning for adopting the WR executive program was concern with its own reputation and client relationships as affected by the ethical conduct of its executives, including tax compliance issues. Waddell & Reed also wanted to ensure that senior executives focused their attention on shareholder matters rather than their own tax and investment affairs. Upon Mr. Tucker's recommendation, Waddell & Reed engaged KPMG to manage the WR executive program. KPMG also served as Waddell & Reed's auditor. Mr. Tucker recommended a friend and former KPMG colleague, Eugene Schorr, to run the WR executive program. Bruce Wertheim, a senior manager at KPMG, assisted Mr. Schorr as a principal adviser.

Mr. Schorr has a bachelor's degree in accounting and a master's degree in taxation and is a C.P.A. and a personal financial specialist. He worked in KPMG's tax compliance group and specialized in individual tax and financial planning, gifts and estates, trust planning, and charitable contributions. Mr. Schorr worked at KPMG (or its predecessors) from 1966 until he retired in 2003, becoming a partner in 1976. During his career Mr. Schorr served as partner in charge of KPMG's New York individual tax practice and as partner in charge of its national personal financial planning practice. During 2000 and 2001 he served as partner in charge of KPMG's national financial planning corporate program.

**[*6]** Mr. Schorr taught an undergraduate estate and gift tax course for 10 years and lectured on income tax, trust, and estate planning issues at various conferences and institutes. He wrote tax articles and served on the editorial board of Taxation for Accountants and as a director of the New York State Society of Certified Public Accountants. Throughout this career Mr. Schorr emphasized the importance of client relationships. In his experience, many senior executives lacked time to handle their own financial and estate planning and tax matters. Mr. Schorr had extensive experience in the development and administration of executive financial planning programs such as the WR executive program. Mr. Tucker considered Mr. Schorr trustworthy and knowledgeable and viewed him as the preeminent person at KPMG for coordinating tax return compliance, tax planning, estate planning, and financial planning for executives.

From 1999 through 2001 KPMG provided Waddell & Reed's senior executives, including Mr. Tucker, with individual tax and financial planning services pursuant to the WR executive program. As part of the WR executive program, KPMG asked Waddell & Reed's senior executives to complete a comprehensive information-gathering document relating to the executives' financial and tax situations and financial and nonfinancial goals. KPMG used the information to develop specific recommendations for the executives.

**[\*7]** B.   <u>Waddell & Reed Stock Options</u>

During his employment with Waddell & Reed, Mr. Tucker participated in an executive deferred compensation stock option plan (WR stock options plan). By 2000 Waddell & Reed's stock had significantly appreciated in the short time since it had gone public in 1998. KPMG anticipated that Waddell & Reed's executives, including Mr. Tucker, would exercise their WR stock options during 2000 to take advantage of the increased stock value and would experience significant increases in their 2000 incomes as a result of exercising the WR stock options. KPMG advised Mr. Tucker on timing and restrictions upon the exercise of the WR stock options. On August 1, 2000, Mr. Tucker exercised 1,776,654 WR stock options. On that same date he exercised 119,513 WR stock options via the Keith A. Tucker Children's Trust Agreement, dated February 21, 2000. On their 2000 joint income tax return, petitioners reported $44,187,744 in wages and salaries, which included $41,034,873 in gain from the exercise of WR stock options. Waddell & Reed withheld Federal income tax of approximately $11.4 million from Mr. Tucker's compensation relating to the exercise of the options.

II.   <u>Evolution of a Tax Strategy</u>

In May 2000 before exercising the WR stock options, Mr. Tucker met with KPMG advisers to discuss his financial and tax planning for 2000 including his

[*8] exercise of the WR stock options. They discussed the need to withhold income tax upon the exercise of the WR stock options. Mr. Schorr also explained the need for Mr. Tucker to diversify his investments. Mr. Tucker viewed his WR investments as conservative and wanted to diversify into riskier investments. Mr. Schorr advised Mr. Tucker that KPMG offered various investment programs that could mitigate his income tax resulting from exercising the WR stock options. Mr. Tucker viewed his conversations with KPMG as part of the WR executive program. KPMG had trained and directed its partners to refer clients with income over a certain threshold to KPMG's Innovative Strategies Group. Mr. Schorr identified Mr. Tucker as a potential client for the Innovative Strategies Group in the spring of 2000 on the basis of Mr. Tucker's 2000 income from his exercise of the WR stock options. Mr. Schorr conferred with Timothy Speiss, the northeast partner in charge of KPMG's Innovative Strategies Group, and with other KPMG partners with respect to Mr. Tucker. Mr. Schorr asked Mr. Speiss to meet with Mr. Tucker to discuss tax strategies to mitigate his 2000 income tax. Mr. Speiss has a bachelor's degree in business with a major in accountancy and a master of science degree in taxation. He began working at KPMG in 1983 and became a partner in 1999. At trial in this case Mr. Speiss asserted his Fifth Amendment privilege against self-incrimination when questioned by respondent's counsel. Mr.

[*9] Tucker relied on Mr. Schorr's recommendation of Mr. Speiss because Mr. Tucker trusted Mr. Schorr. Mr. Tucker viewed his meeting with Mr. Speiss as part of the WR executive program. Mr. Tucker had not previously met Mr. Speiss and was not familiar with KPMG's Innovative Strategies Group, which Mr. Speiss described as offering specialized investment and tax planning advice.

By letter dated June 22, 2000, Mr. Wertheim provided Mr. Tucker with an estimate of Mr. Tucker's income from the planned August 2000 exercise of the WR stock options in anticipation of their upcoming meeting. On June 26, 2000, the KPMG advisers, Messrs. Speiss, Wertheim, and Schorr, met with Mr. Tucker, and Mr. Speiss explained that part of his work was to identify investment opportunities that also had tax benefits and to implement the tax benefits for KPMG's clients. KPMG proposed a tax strategy referred to as "short options" and explained that the strategy would mitigate petitioners' 2000 income tax from the WR stock options (short options strategy). Mr. Schorr explained that the Internal Revenue Service (IRS) could impose accuracy-related tax penalties and that taxpayers could protect themselves from penalties by relying on counsel. Mr. Tucker had previously been unfamiliar with IRS penalties.

On the same day Mr. Tucker also met with a representative of Quadra Associates who was a former KPMG colleague of Messrs. Tucker and Schorr to

[*10] discuss a tax strategy for petitioners' 2000 income tax referred to as the Quadra Forts transaction. Mr. Schorr arranged this meeting. After these meetings Mr. Tucker decided to further pursue and investigate KPMG's short options strategy. Mr. Tucker declined to engage in the Quadra Forts transaction in part because it would require disposition of his WR stock, something he wanted to avoid as Waddell & Reed's CEO. KPMG sent a letter to Mr. Tucker, dated July 25, 2000, that described both tax strategies, which Mr. Tucker received during the first week of August. On August 2, 2000, Mr. Tucker spoke with representatives of KPMG and Helios Financial LLC (Helios) to discuss the mechanics of the short option strategy. After these discussions Mr. Tucker viewed the short options strategy as in a concept stage and he did not yet understand the transaction. KPMG provided an engagement letter to Mr. Tucker, dated August 10, 2000, and signed by Mr. Speiss, for services relating to the short option strategy for a fee of $600,000.

On August 11, 2000, the IRS issued Notice 2000-44, 2000-2 C.B. 255, which described the son of BOSS tax shelter and identified as a "listed" transaction the simultaneous purchase and sale of offsetting options and the subsequent transfer of the options to a partnership. As a result of the issuance of Notice 2000-44, supra, KPMG informed Mr. Tucker that the IRS had identified

[*11] the short options strategy as a listed transaction and KPMG could no longer recommend that strategy. Mr. Tucker no longer wanted to engage in the short options strategy because of the potential negative impact on his personal and professional reputation, his career, and Waddell & Reed's reputation had he engaged in an abusive tax scheme. Mr. Tucker discussed these concerns with KPMG and indicated that he would not want to participate in an abusive tax scheme. As a result of KPMG's disclosure of Notice 2000-44, supra, and its recommendation against the short options strategy, Mr. Tucker believed he could trust KPMG not to advise him to invest in an abusive tax strategy. He believed KPMG was fulfilling its responsibilities under the WR executive program to prevent senior executives from entering into transactions that could create trouble with the IRS.

Mr. Tucker and KPMG began to discuss other tax mitigation strategies for Mr. Tucker's 2000 tax planning. In fall 2000 Mr. Tucker reconsidered the Quadra Forts transaction, upon KPMG's advice, and met with Quadra Associates. KPMG provided tax advice to Mr. Tucker on the Quadra Forts transaction and consulted with Quadra Associates as Mr. Tucker's adviser. Mr. Tucker decided to participate in the Quadra Forts transaction. The Quadra Forts transaction was scheduled to commence on December 18, 2000. Issues arose concerning Quadra

**[*12]** Associates' unwillingness to share details about the transaction with KPMG, and the lack of disclosure could have prevented KPMG from being able to sign petitioners' 2000 return as return preparer. On December 12, 2000, Quadra Associates advised KPMG that financing for the Quadra Forts transaction was in jeopardy and the transaction might not close. On December 14, 2000, Mr. Tucker was advised that the Quadra Forts transaction could not be completed because of a lack of financing. During this period, when Mr. Tucker first considered the short options strategy in June 2000 through the failure of the Quadra Forts transaction in mid-December 2000, Mr. Tucker had little direct communication with Mr. Speiss.

After the Quadra Forts transaction fell through, Mr. Speiss discussed with and sought approval from several members in KPMG's tax leadership positions to develop and propose a customized tax solution to mitigate Mr. Tucker's 2000 income tax by the end of the year. Mr. Speiss informed Mr. Schorr that he intended to propose a potential customized tax strategy to Mr. Tucker that involved foreign currency options. Mr. Schorr followed up with at least one member of KPMG's tax leadership to confirm that the tax leadership approved a customized tax solution for Mr. Tucker because of the sensitive nature of yearend tax strategies and because Mr. Schorr understood that KPMG would not pursue

[*13] certain types of tax strategies for its clients after issuance of Notice 2000-44, supra.

On December 15, 2000, Mr. Speiss spoke with Mr. Tucker and recommended a transaction involving foreign currency options (FX transaction). KPMG customized and recommended the FX transaction to three Waddell & Reed senior executives, including Mr. Tucker. One of the other executives also executed the transaction. Mr. Speiss identified four entities, Helios, Diversified Group, Inc. (DGI), Alpha Consultants, LLC (Alpha), and Lehman Brothers Commercial Corp. (Lehman Brothers), a global financial services firm, that would collectively execute and manage the FX transaction. Mr. Tucker understood that Helios, DGI, and Alpha (promoter group) were investment advisers that would assist in implementing the FX transaction and that DGI had designed the FX transaction. Individuals associated with the promoter group explained the potential profit and loss associated with the FX transaction and informed Mr. Tucker that both the potential profit and loss would be capped. The promoter group told Mr. Tucker that he had a potential return of $800,000 on the FX transaction, after transaction costs and fees, and the probability that he would earn a profit was 40%. Mr. Tucker viewed an $800,000 profit over a short period as a good investment. In fact Mr. Tucker had a net economic loss on the FX

[*14] transaction of approximately $695,000. Mr. Tucker knew about the tax benefits of the FX transaction; he also knew the IRS might disallow the loss deduction from the transaction.

On December 16, 2000, Mr. Speiss sent a letter to Mr. Tucker concerning the FX transaction and transmitting a profit and loss summary for the FX transaction and a summary of "review points" being considered by KPMG. The letter included an attachment titled "CFC timeline". The CFC timeline contained the following table:

| | |
|---|---|
| Fri., Dec. 15 | Purchase stock of CFC; enter into shareholder's agreement; fund CFC; acquire options. |
| Wed., Dec. 27 | Latest date for sale of gain legs and purchase of replacement options |
| Thurs., Dec. 28 | Latest effective date of check-the-box election |
| Fri., Dec. 29 | Remaining positions expire or are sold |
| Mar. 13, 2001 | Latest date for making retroactive check-the-box election |
| Tax return due date | Sec. 367(b) gain election |
| Sept. 15, 2001 | Sec. 338 election |

On December 18, 2000, Mr. Tucker spoke with Messrs. Schorr and Speiss by telephone about the FX transaction. Mr. Tucker decided to implement the FX transaction and signed an engagement letter, dated December 27, 2000, for KPMG

[*15] to provide tax consulting services relating to the FX transaction. Mr. Tucker worked with Mr. Speiss to implement the transaction during the last two weeks of December 2000, including after Mr. Tucker left for a two-week vacation on December 19, 2000. Mr. Schorr did not participate in meetings and discussions between Messrs. Tucker and Speiss relating to the FX transaction. Mr. Tucker understood that Mr. Schorr was not involved in implementing the FX transaction.

III. Relevant Entities

Mr. Tucker implemented the FX transaction through three entities: Sligo (2000) Company, Inc. (Sligo), Sligo (2000), LLC (Sligo LLC), and Epsolon, Ltd. (Epsolon). In December 2000 Mr. Tucker incorporated Sligo under Delaware law, with Mr. Tucker owning all outstanding stock. Sligo elected S corporation status for Federal income tax purposes, effective December 18, 2000. In December 2000 Mr. Tucker also organized Sligo LLC under Delaware law pursuant to a limited liability company agreement dated December 19, 2000. From its inception until December 26, 2000, Mr. Tucker was the sole member of Sligo LLC. On December 26, 2000, Mr. Tucker transferred his ownership interest in Sligo LLC to Sligo.

Epsolon was a foreign corporation organized under the laws of the Republic of Ireland on November 6, 2000. When Epsolon was initially organized,

[*16] Cumberdale Investment, Ltd. (Cumberdale), also a foreign corporation existing under the laws of the Republic of Ireland, owned all 100 shares of Epsolon's issued and outstanding stock. On December 18, 2000, Sligo purchased 99 Epsolon shares from Cumberdale for $10,000. From December 18 through 31, 2000, Sligo owned 99 shares and Cumberdale owned 1 share. Petitioners did not directly or indirectly own any interest in Cumberdale. Epsolon elected partnership classification for Federal income tax purposes effective December 27, 2000.

On December 18, 2000, Cumberdale and Sligo entered into a shareholder agreement to make capital contributions to Epsolon: Cumberdale agreed to contribute $15,300 and Sligo agreed to contribute $1,514,700 for a total contribution of $1,530,000. Mr. Tucker opened two accounts at Lehman Brothers, one on behalf of Epsolon (Epsolon account) and the other on behalf of Sligo LLC (Sligo LLC account).[3] On December 20, 2000, Mr. Tucker transferred $1,530,000 into the Epsolon account. Mr. Tucker made two transfers into the Sligo LLC account of $510,000 and $500,000 on December 20 and 28, 2000, respectively.

---

[3]Mr. Tucker signed new account forms with Lehman Brothers that referenced Notice 2000-44, 2002-2 C.B. 255. The reference to the notice did not raise concerns with Mr. Tucker about the validity of the FX transaction as he considered it to be boilerplate.

[*17] IV.    FX Transaction

The FX transaction consisted of two components.  The first component (Epsolon loss component) was structured in accordance with the CFC timeline outlined above.  The second component (Sligo LLC basis component) was structured to increase the basis in an S corporation, Sligo, through which the Epsolon loss could pass through to Mr. Tucker.

a.    Epsolon's Loss Component

i.    December 20, 2000, Foreign Currency Transactions

On December 20, 2000, Epsolon purchased the following four foreign currency options (euro options) from Lehman Brothers tied to the U.S. dollar and the European euro (USD/euro) for a combined premium of $156,041,0

| Option | Strike price | Payoff amount | Premium |
| --- | --- | --- | --- |
| Long euro call I | .9208 USD/euro | $187,637,704 | $56,451,951 |
| Long euro call II | .9208 USD/euro | 71,710,943 | 21,568,993 |
| Long euro put I | .8914 USD/euro | 187,445,332 | 56,451,284 |
| Long euro put II | .8914 USD/euro | 71,637,538 | 21,568,773 |

On December 20, 2000, Epsolon wrote to Lehman Brothers the following euro options for a combined premium of $157,500,000:

[*18]

| Option | Strike price | Payoff amount | Premium |
|--------|--------------|---------------|---------|
| Short euro call I | .9207 USD/euro | $189,827,513 | $57,000,000 |
| Short euro call II | .9207 USD/euro | 72,434,183 | 21,750,000 |
| Short euro put I | .8915 USD/euro | 189,635,141 | 57,000,000 |
| Short euro put II | .8915 USD/euro | 72,360,777 | 21,750,000 |

The eight euro options expired on January 8, 2001. The total net premium payable by Lehman Brothers to Epsolon relative to the above eight euro options (December 20, 2000, euro options) was $1,458,999, which was posted as a credit to the Epsolon account at Lehman Brothers. In addition to the net premium, Epsolon was required to post a margin of $1,448,986. The sum of these amounts, together with the accrued interest, was intended as collateral for the amount Epsolon could owe on the December 20, 2000, euro options if the USD/euro exchange rate was below .8914 or above .9208 at expiration.

On the basis of the euro options, Mr. Tucker's advisers determined there were three possible outcomes at expiration:[4]

1. If the USD/euro exchange rate was below .8914 USD/euro, the parties would exercise four of the euro options (long euro put I, long

---

[4]On brief respondent alleged three possible outcomes with slightly different amounts of potential loss or gain and used exchange rates of .8915 USD/euro and .9207 USD/euro. The difference is immaterial for our decision.

[*19]      euro put II, short euro put I, and short euro put II), and Epsolon would owe a net $2,913,048 to Lehman Brothers, which would result in the return of the $1,458,999 credit and an additional loss of $1,454,049;

2.      if the USD/euro exchange rate was above .8914 and below .9208 USD/euro, the parties would not exercise any of eight options, and Epsolon would realize a gain of $1,458,999 (the net premium credited to its account); or

3.      if the USD/euro exchange rate was above .9208 USD/euro, the parties would exercise four of the euro options (long euro call I, long euro call II, short euro call I, and short euro call II), and Epsolon would owe $2,913,049 to Lehman Brothers, which would result in the return of the $1,458,999 credit and an additional loss of $1,454,050.

### 2.      December 21, 2000, Foreign Currency Transactions

On December 21, 2000, the euro appreciated against the U.S. dollar. On December 21, 2000, Epsolon disposed of the following four December 20, 2000, euro options for a net gain of $51,260,455:

| Option | Sold for | Closed out for | Gain |
| --- | --- | --- | --- |
| Long euro call I | $75,714,627 | --- | $19,262,676 |
| Long euro call II | 28,131,028 | --- | 6,562,035 |
| Short euro put I | --- | $38,155,202 | 18,844,798 |
| Short euro put II | --- | 15,159,054 | 6,590,946 |

On the same day, Epsolon purchased from Lehman Brothers the following two foreign currency options tied to the Deutschmark (DEM) and the U.S. dollar (Deutschmark options) for a combined premium of $103,918,493:

[*20]

| Option | Strike price | Payoff amount | Premium |
|--------|--------------|---------------|---------|
| Long DEM call I | 2.1241 DEM/USD | $187,751,702 | $75,760,627 |
| Long DEM call II | 2.1241 DEM/USD | 71,779,358 | 28,157,866 |

Epsolon sold to Lehman Brothers the following two Deutschmark options for a combined premium of $53,316,100:

| Option | Strike price | Payoff amount | Premium |
|--------|--------------|---------------|---------|
| Short DEM put I | 2.1939 DEM/USD | $189,640,141 | $38,156,208 |
| Short DEM put II | 2.1939 DEM/USD | 72,364,777 | 15,159,892 |

Each of the Deutschmark options expired on January 8, 2001. On the basis of the four Deutschmark options, Epsolon owed a net premium to Lehman Brothers of $50,602,393. Epsolon paid the net premium in part by $50,531,399 in proceeds from the disposition of four December 20, 2000, euro options. Epsolon's acquisition of the Deutschmark options required it to pay an additional $70,994 premium and to post an additional margin of $9,006.

### 3. December 28, 2000, Foreign Currency Transactions

On December 28, 2000, Epsolon disposed of the following four foreign currency options for a net loss of $38,483,893:

[*21]

| Option | Sold for | Closed out for | Gain/loss |
|---|---|---|---|
| Long DEM call I | $124,340,670 | --- | $48,580,043 |
| Long euro put I | 4,565,799 | --- | (51,885,485) |
| Short euro call I | --- | $125,715,399 | (68,715,399) |
| Short DEM put I | --- | 4,619,260 | 33,536,948 |

4.  January 8, 2001, Foreign Currency Transactions

On January 8, 2001, the four remaining euro and Deutschmark options expired. As of January 8, 2001, Epsolon had not exercised four options, which expired as follows:

1.  the long DEM option call II expired, and Lehman Brothers owed $71,779,358 to Epsolon;

2.  the short euro call option II expired, and Lehman Brothers owed $72,434,183 to Epsolon;

3.  the long euro put option II expired out of the money; and

4.  the short DEM put option II expired out of the money.

B.  Sligo LLC Basis Component

On December 21, 2000, Sligo LLC purchased from Lehman Brothers a long put option to sell 14,392,491,546 Japanese yen (yen option) at a strike price of 108.96 yen to the U.S. dollar for a $51 million premium. Also on December 21,

[*22] 2000, Sligo LLC sold a yen put option to Lehman Brothers to sell 14,277,335,279 yen at a strike price of 108.97 yen to the U.S. dollar for a premium of $50,490,000. Both yen options expired on December 21, 2001, a one-year period from execution to maturity. Sligo LLC owed Lehman Brothers a net premium of $510,000 for the two yen options. If the yen/USD exchange rate was above 108.96 at expiration, Sligo LLC would receive a net payment of 115,136,267 yen (worth between $1,081,390 and $1,068,710). If the yen/USD exchange rate was below 108.96 at expiration, both yen options would expire worthless, and Sligo LLC would lose the $510,000 premium paid to Lehman Brothers.

On December 26, 2000, Mr. Tucker transferred his 100% ownership interest in Sligo LLC to Sligo. Epsolon took the reporting position that: (1) it was a controlled foreign corporation (CFC) for a period of nine days before it elected partnership classification, i.e., the taxable year ended December 26, 2000, and (2) its partnership election resulted in a deemed liquidation of Epsolon but did not result in any taxable income to Epsolon. See sec. 301.7701-3(g)(1)(ii), Proced. & Admin. Regs. In calculating Mr. Tucker's basis in his Sligo stock, petitioners increased Mr. Tucker's basis by the $51 million premium paid for the long yen put option and $2,024,700 in purported cash contributions. However, Mr. Tucker did

**[\*23]** not decrease his Sligo stock basis by the premium received for the short yen put option. Mr. Tucker claimed a basis in his Sligo stock of $53,024,700. Petitioners' basis calculation for the Sligo stock was based on the position that the obligation to fulfill the short yen put option was a "contingent" obligation which did not reduce Mr. Tucker's basis in his Sligo stock under section 358(a) and (d).

The Sligo LLC yen options created a basis component of the FX transaction similar to the basis inflation identified in Notice 2000-44, supra. Mr. Tucker was not aware that the FX transaction involved a basis component at the time he executed the FX transaction. Mr. Tucker had received but did not read written communications that referred to a basis component. Petitioners have conceded the Sligo LLC basis component but continue to argue that Mr. Tucker is entitled to a basis in his Sligo stock, as of December 31, 2000, for purported cash contributions of $2,024,700 that he had made during the 2000 tax year.[5]

V.    Professional Advice on Mr. Tucker's 2000 Tax Year

KPMG represented to Mr. Tucker that the FX transaction was not covered by Notice 2000-44, supra. Mr. Tucker did not read Notice 2000-44, supra, because he did not think that he would understand it and because he trusted his

---

[5]Respondent asserts that petitioners have not substantiated the capital contribution.

[*24] KPMG advisers. Mr. Tucker understood that KPMG would not provide an opinion regarding the tax effects of the FX transaction because KPMG was Mr. Tucker's return preparer and because Mr. Speiss had planned the FX transaction. KPMG orally communicated to Mr. Tucker that the claimed tax treatment of the FX transaction was warranted. KPMG indicated that it would sign petitioners' return reporting the FX transaction, giving Mr. Tucker comfort that the FX transaction was a legitimate tax planning solution.

A.    Brown & Wood Tax Opinions

On or around December 26, 2000, Mr. Tucker engaged the law firm Brown & Wood to provide a tax opinion with respect to the FX transaction upon KPMG's recommendation. KPMG had recommended three law firms to Mr. Tucker, and he chose Brown & Wood to provide the opinions because he was familiar with the firm. Mr. Tucker understood that he needed a legal opinion as an "insurance policy" to ensure that the tax treatment of the FX transaction was proper and to protect against risk of IRS penalties. Mr. Tucker did not understand that Brown & Wood was involved with the development of the FX transaction. Mr. Tucker had a conference call with Mr. Speiss and counsel from Brown & Wood on December 15, 2000.

[*25] In late January 2001 James Haber, president of DGI, advised R.J. Ruble, a tax partner at Brown & Wood, that Mr. Tucker would require two opinions with respect to the FX transaction: one relating to the Sligo LLC basis component (Sligo opinion) and the second relating to a loss generated by the Epsolon loss component (Epsolon opinion). DGI's general counsel had prepared a draft memorandum, dated October 25, 2000, discussing the U.S. tax consequences of a CFC strategy similar to that used in the Epsolon loss component (CFC memorandum). The CFC memorandum included the CFC timeline given to Mr. Tucker before he engaged in the FX transaction. DGI provided the CFC memorandum and also a form legal opinion relating to the Sligo LLC basis component to Mr. Ruble when he was preparing the two Brown & Wood opinions. The two Brown & Wood opinions concluded Mr. Tucker's tax treatment of the FX transaction would more likely than not withstand IRS scrutiny and referenced multiple tax-law doctrines, including the sham transaction doctrine, economic substance, the step transaction doctrine, section 465 at-risk rules, and the basis adjustment rules.

Mr. Tucker received the Sligo opinion after filing his 2000 income tax return, having filed the return approximately three weeks before the due date in order to obtain his expected refund of the tax withheld with respect to the WR

[*26] stock options. Mr. Tucker received the Epsolon opinion before he filed his 2000 return. Mr. Tucker questioned KPMG, as his tax return preparer, about the need to wait to file his 2000 return until he received both opinions. KPMG advised him that a delay in filing was not necessary because KPMG confirmed the opinions were forthcoming. Petitioners presented expert testimony that it was within acceptable practice standards at the time of the FX transaction to provide a tax opinion after the filing of a tax return. Both opinions were backdated to December 31, 2000; petitioners' expert noted no advantage to backdating an opinion, and backdating was not part of practice standards. Mr. Tucker did not read the Brown & Wood opinions, believing that he would not understand their technical nature. Mr. Tucker relied on KPMG to review the Brown & Wood opinions, consistent with his normal practice. There is no evidence in the record concerning Brown & Wood's fee for the two opinions or how the fee was paid.

B.    Speiss Memorandum

Mr. Speiss prepared a 48-page single-spaced memorandum addressed to Mr. Tucker, dated January 8, 2001 (Speiss memorandum), that summarized the FX transaction and analyzed the tax consequences of the FX transaction. The Speiss memorandum states it is not a tax opinion. The memorandum described the application of the relevant Code provisions relied on for petitioners' reporting

[*27] position and provided an analysis of various statutory provisions and judicial doctrines that the IRS could attempt to use to challenge or recharacterize the FX transaction, including economic substance, sham transaction, sham partnership, and step transaction doctrines, at-risk rules, and partnership antiabuse rules. The Speiss memorandum concluded that Notice 2000-44, supra, should not apply and the FX transaction should not trigger the substantial understatement penalty. Mr. Tucker understood that the purpose of the Speiss memorandum was to support KPMG's signature as tax return preparer on petitioners' 2000 return claiming the loss from the FX transaction. KPMG prepared and signed petitioners' 2000 return in accordance with the Speiss memorandum. In January 2001 Mr. Tucker received a copy of the Speiss memorandum but did not read it.

C.    Schorr Memorandum

Mr. Schorr prepared an internal four-page memorandum to file (Schorr memorandum) dated January 18, 2001, that described advice and recommendations that KPMG provided to Mr. Tucker during 2000. Mr. Schorr did not expect that Mr. Tucker would read the Brown & Wood opinions. Mr. Tucker received the Schorr memorandum before filing his 2000 return. He read the Schorr memorandum because it was a short document and because he had not requested it and was not aware that Mr. Schorr had drafted a memorandum. He

[*28] described the Schorr memorandum as written in layman's terms for a client to understand. The Schorr memorandum indicated that Mr. Schorr drafted it in response to the IRS' increased scrutiny of tax solutions as announced in Notice 2000-44, supra. The Schorr memorandum memorialized KPMG internal discussions about the implementation of a tax solution for Mr. Tucker, including the short options strategy, the Quadra Forts transaction, and the FX transaction. The memorandum stated that Mr. Speiss had conferred with DGI and Brown & Wood to develop a customized tax solution for Mr. Tucker and that Mr. Speiss had developed the tax and investment structure with Helios and Brown & Wood. Despite the statements in the Schorr memorandum, Mr. Tucker did not understand that Brown & Wood had a conflict of interest that precluded its providing an independent legal opinion.

The Schorr memorandum summarized discussions with Mr. Tucker about his unwillingness to enter into a transaction that could result in IRS penalties. The memorandum indicated possible IRS penalties of $4 million as a result of the FX transaction and advice given to Mr. Tucker to make a $5 million long-term investment to hedge against penalties. Mr. Tucker invested $3 million in junk-bond, high-yield securities and $1 million in fixed-income instruments and hedging transactions. The Schorr memorandum also summarized KPMG internal

[*29] discussions on fees charged to Mr. Tucker. KPMG charged Mr. Tucker a $500,000 fee for services relating to the FX transaction, and the Schorr memorandum referred to an initial fee of $250,000. The Schorr memorandum stated that Mr. Speiss insisted on a larger fee because he had developed and implemented the FX transaction from beginning to end. The memorandum also stated that a fee based on hours of service would be between $250,000 and $300,000. Mr. Tucker also paid a $1,020,000 fee to Helios relating to the FX transaction. The relationship between Helios and DGI is unclear from the record.

Mr. Schorr knew that the IRS might disallow the claimed tax treatment of the FX transaction but believed that Mr. Tucker would not be subject to IRS penalties. This comports with Mr. Tucker's understanding of the advice he received from KPMG. Although Mr. Schorr wrote in his memorandum that Mr. Speiss developed the FX transaction with Helios and Brown & Wood, Mr. Schorr did not realize that Brown & Wood would have a conflict of interest when providing a tax opinion. Mr. Schorr did not receive copies of the Brown & Wood opinions and did not read the opinions.

VI.    Tax Reporting

For 2000, Epsolon, a foreign entity, reported a $38,483,893 net loss from the December 28, 2000, disposition of the four foreign currency options plus an

**[*30]** additional loss from transaction costs of $1,100,618 for a total loss of $39,584,511 (option loss). Epsolon allocated $39,188,666 of the option loss to Sligo on the basis of Sligo's 99% ownership. Sligo reported this option loss on its S corporation return for the period December 18 to 31, 2000. On their 2000 joint return, petitioners reported a loss of $39,203,302, consisting, in large part, of the $39,188,666 passthrough loss from Sligo. Petitioners also reported a $13,742,247 loss from Sligo on their 2001 joint return for a total loss of over $52.9 million for the two years 2000 and 2001.[6]

VII.   Subsequent Adviser Communications and Proceedings

In March 2002 Brown & Wood, then part of Sidley, Austin, Brown & Wood LLP (Sidley Austin), sent Mr. Tucker a letter informing him of the IRS' newly announced voluntary disclosure program, for taxpayers who had participated in

---

[6]Epsolon was not subject to TEFRA procedures because it was a foreign partnership pursuant to sec. 6031(e) for the year in issue. For 2001 Epsolon reported a net loss of $13,890,954 relating to the January 8, 2001, expiration of the four remaining foreign currency options. Sligo, as 99% partner, reported a $13,758,878 loss from Epsolon on its 2001 S corporation return, and petitioners reported a $13,742,247 loss from Sligo on their 2001 joint return. Respondent issued a notice of deficiency to petitioners for 2001, and petitioners filed a timely petition. The Court dismissed the case for lack of jurisdiction on the basis that the notice of deficiency was invalid because of a related TEFRA partnership proceeding, which was not yet completed. The 2001 losses are at issue in a partnership-level proceeding filed in the Court of Federal Claims. That case has been stayed pending the disposition of this case.

[*31] tax shelters, that allowed taxpayers to avoid accuracy-related penalties. IRS Announcement 2002-2, 2002-1 C.B. 304. Brown & Wood recommended that Mr. Tucker consult his regular tax adviser about the voluntary disclosure program. Mr. Tucker discussed IRS Announcement 2002-2, supra, with Messrs. Schorr and Speiss, who advised Mr. Tucker not to make a voluntary disclosure about the FX transaction or to seek amnesty from IRS penalties because the FX transaction was not a tax shelter and was not subject to the voluntary disclosure program. By letter dated April 24, 2002, Mr. Speiss sent Mr. Tucker a copy of the Speiss memorandum.

As part of a promoter examination of KPMG, the IRS issued summonses to KPMG for the names of clients to whom KPMG had sold transactions covered by Notice 2000-44, supra. In August 2003 KPMG advised Mr. Tucker for the first time that the FX transaction was a tax shelter subject to Notice 2000-44, supra. In September 2003 Mr. Tucker filed a John Doe lawsuit against KPMG in U.S. District Court to enjoin the disclosure of his identity to the IRS. The Government subsequently intervened, and the District Court dismissed the John Doe suit three days before the period of limitations for petitioners' 2000 tax year expired. KPMG disclosed Mr. Tucker's identity to the IRS in response to the summons.

**[*32]**  On April 15, 2004, respondent issued a notice of deficiency to petitioners for 2000, disallowing a $39,188,666 loss deduction and determining a deficiency of $15,518,704 and a section 6662 accuracy-related penalty of $6,206,488.  Mr. Tucker disclosed receipt of the deficiency notice to Waddell & Reed's board of directors and other senior executives.  In May 2005 Mr. Tucker resigned from Waddell & Reed as his tax issues began to draw more attention in the media.  The board of directors had advised Mr. Tucker that if he did not resign, he would be fired.

In August 2005 KPMG entered into a deferred prosecution agreement with the Government in which it admitted that it had participated in tax shelter transactions as part of a criminal conspiracy in an attempt to defraud the United States.  KPMG agreed to pay the Government $456 million in restitution, penalties, and disgorgement of fees.  In May 2007 Sidley Austin entered into a settlement with the IRS in which it agreed to pay a tax shelter promoter penalty of $39.4 million.

In April 2009 Mr. Tucker filed an arbitration complaint against KPMG and Sidley Austin before the American Arbitration Association for damages resulting from alleged fraudulent conduct relating to KPMG's advice in connection with the FX transaction.  Mr. Tucker alleged that KPMG had made false representations

[*33] concerning the validity of the FX transaction and the risk of IRS penalties. Mr. Tucker pursued the arbitration complaint to recover for damage to his reputation and career as a result of his involvement in the FX transaction and the resulting IRS case against him and to recover damages in connection with potential IRS penalties for 2000 and 2001. Mr. Tucker learned during the arbitration that his 2000 tax reporting position with respect to the FX transaction involved a basis-inflation component. In November 2010 KPMG entered into a settlement agreement with Mr. Tucker for an amount that would have substantially compensated for Mr. Tucker's lost salary, bonuses, and equity participation due to his forced resignation from Waddell & Reed as alleged in the complaint. Sidley Austin also settled Mr. Tucker's claim for $1,050,000.

VIII. Expert Witnesses

Respondent submitted two expert reports prepared by David F. DeRosa and Thomas Murphy.[7] Dr. DeRosa's report focuses on analyzing whether each spread position was a single economic position and concludes that each spread position represented a single economic position. Dr. DeRosa explained that the options

_____

[7]Voir dire of Mr. Murphy at trial revealed that he had not updated his curriculum vitae with respect to certain aspects of his employment history and trials in which he had testified in the prior four years in violation of Rule 143(g)(1)(E). As a result, we did not permit Mr. Murphy to testify and did not admit his report into evidence.

[*34] were entered into as spreads and not as individual components and should not be separated. Dr. DeRosa testified that if Epsolon and Sligo LLC had entered into each option separately, Lehman Brothers would have required them to post massive margin amounts to cover potential liabilities. The lack of such amounts indicates that the parties to the options viewed each spread as a single economic position according to Dr. DeRosa. Dr. DeRosa opined that the options were economically inseparable. Dr. DeRosa also calculated that the expected rate of return on the option transactions was negative, exclusive of fees. Dr. DeRosa also concluded that both the Epsolon and Sligo LLC options were mispriced to Mr. Tucker's disadvantage.

Petitioners submitted an expert report by H. Gifford Fong. Mr. Fong's report evaluates whether the Epsolon foreign currency option transactions were valued consistent with market prices and whether Mr. Tucker had a reasonable profit potential with respect to the Epsolon options. Mr. Fong concludes that the option transactions were valued properly and that there was a reasonable prospect for profit, net of fees and expenses. Mr. Fong determined that Mr. Tucker had a 40% chance of profit on both the Epsolon options and the Sligo LLC options. Dr. DeRosa agreed with Mr. Fong's probability calculation but also explained that Mr.

[*35] Tucker would have needed to profit on both sets of options to earn a profit net of fees and that the likelihood of profiting on both sets would be lower.

OPINION

Petitioners argue that they are entitled to deduct the loss on the Epsolon options to the extent of Mr. Tucker's basis in Sligo. Having conceded Sligo's basis arising from the Sligo LLC options, petitioners assert that Mr. Tucker had a $2,024,700 basis in Sligo in 2000 on the basis of alleged cash contributions. Petitioners assert that they are entitled to deduct $2,024,700 of Sligo's loss in 2000 and to carry forward the remainder of the 2000 loss to future years to the extent of Mr. Tucker's basis in Sligo and its successor corporation, Starview Enterprises, Inc. Petitioners argue that specific and detailed provisions of the Code and the regulations dictate the tax treatment of the Epsolon options, which we should respect. In support of their position, petitioners assert that the Epsolon loss component yielded the loss claimed pursuant to the following analysis:

(1) Epsolon realized an aggregate gain of $51,260,455 in 2000 when it disposed of four euro options on December 21, 2000.

(2) Epsolon did not recognize the $51,260,455 gain for U.S. tax purposes because (i) Epsolon was a foreign corporation not subject to tax under section 881

**[\*36]** or 882[8] at the time of the gain and (ii) Sligo was not required to include its share of Epsolon's gain under section 951 because Epsolon was a CFC for less than 30 days when it elected partnership status.

(3) Epsolon and Sligo were not required to recognize gain or loss when Epsolon elected partnership status because Epsolon made an election that allowed it to recognize gain equal to Sligo's basis in its Epsolon stock and Sligo had a zero basis in its Epsolon stock. See sec. 1.367(b)-3T(b)(4)(i)(A), Temporary Income Tax Regs., 65 Fed. Reg. 3588 (Jan. 24, 2000).

(4) After Epsolon became a U.S. partnership, it disposed of an additional four foreign currency options for a net loss of $38,483,893 and transaction costs of $1,100,618 in 2000 for a total loss of $39,584,511.

(5) Sligo was required to take into account its distributive share of Epsolon's net loss, which passed through to Mr. Tucker, as Sligo's S corporation shareholder, and the loss was deductible under section 165(a) and characterized as ordinary under section 988.

---

[8]Sec. 881 imposes a tax of 30% on foreign corporations on amounts of "fixed or determinable annual or periodical gains" income from sources within the United States. Sec. 882(a)(1) taxes foreign corporations on income "effectively connected with the conduct of a trade or business within the United States."

[*37] Respondent asserts several arguments against petitioners' entitlement to the ordinary loss deduction. Specifically, respondent argues that we should disallow petitioners' claimed loss deduction because (i) the Epsolon options lacked economic substance, (ii) the Epsolon loss was not bona fide and the Epsolon options were not entered into for profit, (iii) the step transaction doctrine prevents separating the gain from the loss on the Epsolon options, (iv) the loss should be allocated to Epsolon before the partnership election while it was a CFC because the gain and loss legs of the options are a single economic position under section 988, (v) the principal purpose of Mr. Tucker's acquisition of Epsolon and Sligo stock was to evade or avoid Federal income taxes, and (vi) Mr. Tucker was not at risk for the claimed loss under section 465.

We agree with respondent that the Epsolon options lacked economic substance. A taxpayer may not deduct losses resulting from a transaction that lacks economic substance even if that transaction complies with the literal terms of the Code. See Southgate Master Fund, LLC ex rel. Montgomery Capital Advisors LLC v. United States, 659 F.3d 466, 479 (5th Cir. 2011); Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1352-1355 (Fed. Cir. 2006). Accordingly, we do not address respondent's remaining arguments.

**[*38]** I.   Background:  Code and Regulations Applicable to the FX Transaction

Petitioners argue that the Code imposes clear, mechanical provisions to determine the taxation of foreign corporations.  Petitioners contend that we must give effect to the applicable Code and regulatory provisions as written because Congress "knowingly and explicitly" enacted laws to permit the tax treatment that petitioners claimed.  The tax strategy at issue involved two separate components that both used offsetting foreign currency options to create a tax benefit:  (1) the Epsolon loss component used offsetting foreign currency options to generate losses and (2) the Sligo LLC basis component used offsetting foreign currency options to create a basis in an S corporation through which the Epsolon losses could flow to petitioners' joint tax return.  These two components were structured and executed to work in tandem in order to generate an artificial loss to offset petitioners' nearly $50 million in taxable gains in 2000 and 2001.  As petitioners argue that the mechanical provisions of the Code and the regulations dictate the tax treatment of the loss on the Epsolon options, we review the tax treatment below.

**[\*39]**  A.    <u>Epsolon Loss Component</u>

Mr. Tucker generated the claimed tax loss through Epsolon.  At the time Mr. Tucker acquired ownership of Epsolon, it was a foreign corporation for U.S. tax purposes.  Mr. Tucker owned 99% of Epsolon through his wholly owned S corporation, Sligo.  Epsolon executed the loss component in four steps:  (1) Epsolon acquired various offsetting foreign currency digital option spread positions (spread positions); (2) it disposed of the gain legs of the spread positions while Epsolon was a CFC; (3) it made a "check-the-box" election to become a partnership for U.S. tax purposes; and (4) it disposed of the loss legs of the spread positions.  Petitioners argue that Epsolon's gain on the options realized while a CFC is foreign source and not recognized for U.S. tax purposes and that Epsolon's losses after it became a partnership are U.S. source and pass through to Sligo as U.S. source loss.  As an S corporation, Sligo would pass its losses through to Mr. Tucker, its sole shareholder.  Accordingly, Mr. Tucker claimed the Epsolon losses on his joint return.

1.    <u>Taxation of Gain From Epsolon Options to a CFC</u>

Petitioners argue that Congress chose not to tax foreign source income of a CFC in existence for less than 30 days with no business activities other than buying and selling foreign currency options.  Epsolon was a CFC for nine days.

[*40] Section 882(a)(1) taxes foreign corporations engaged in a trade or business within the United States. A trade or business within the United States generally does not include trading in stocks, securities, or commodities through an agent. Sec. 864(b)(2)(A) and (B). As Epsolon's activities were limited to foreign currency option trades through an agent, it did not have a trade or business within the United States during 2000. Accordingly, Epsolon's gain was not taxable under section 882(a)(1). Furthermore, Epsolon's gain on the options was not fixed or determinable annual or periodical income taxable to foreign corporations under section 881(a)(1). Sec. 1.1441-2(b)(2)(i), Income Tax Regs. (stating that gain from the sale of property generally is not fixed or determinable annual or periodical income).

According to petitioners' mechanical application of the Code and the regulations, petitioners could be taxed on Epsolon's gain only under section 951. However, Epsolon avoided the application of the section 951 income inclusion rules. Section 951 requires a U.S. shareholder of a CFC to include in gross income its pro rata share of the CFC's subpart F income. Subpart F income would include gain on the Epsolon options. Secs. 951(a)(1), 952(a)(2), 954(c)(1)(C). The section 951 income inclusion rule applies only if the corporation is a CFC for an uninterrupted period of 30 days. Sec. 951(a)(1). Epsolon existed as a CFC for

**[*41]** less than 30 days because it made an election to be treated as a partnership for Federal income tax purposes. Accordingly, under the mechanical application of the rules, Sligo was not required to include Epsolon's gain on the options in its income. Petitioners contend that the Epsolon gain nevertheless had U.S. tax consequences on the basis that Sligo was required to account for the gain in its earnings and profits.

### 2. Loss on Epsolon Options After Partnership Election

Effective December 27, 2000, Epsolon elected partnership status, becoming a partnership for Federal income tax purposes. The partnership election resulted in two events: (i) the electing entity is deemed to distribute its assets and liabilities to its shareholders in a complete liquidation and (ii) the shareholders are then deemed to contribute the same assets and liabilities to a newly formed partnership for Federal income tax purposes. Sec. 301.7701-3(g)(1)(ii), Proced. & Admin. Regs. As a result of Epsolon's partnership election, Epsolon distributed the remaining eight options to its shareholders, Sligo and Cumberdale, a foreign entity, in a complete liquidation on December 26, 2000. Sligo received a carryover basis in its share of Epsolon's assets that Sligo was deemed to receive in the deemed liquidation. See sec. 334(b)(1). Section 332(a) provides for nonrecognition treatment on a liquidating distribution from a corporation to

[*42] another corporation. Section 332(b) defines the scope of the nonrecognition treatment. Section 332(b) provides that a distribution is considered to be in complete liquidation if (1) the corporate shareholder owns at least 80% of the total combined voting power and 80% of the total number of shares of all other classes of stock and (2) the distribution is in complete cancellation or redemption of all the stock, and the transfer of all the assets occurs within the taxable year. By interposing Sligo as the 99% owner of Epsolon, rather than directly owning Epsolon himself, Mr. Tucker structured the transaction to take advantage of the section 332 nonrecognition rule for corporate shareholders and avoided recognizing gain from the deemed liquidation upon Epsolon's partnership election.

Section 367(b) provides for an exception to the section 332 nonrecognition treatment that would have required Sligo as a U.S. corporate shareholder to recognize gain on the remaining eight options that were deemed distributed from Epsolon upon the partnership election. Under section 367(b) and related regulations, a domestic parent is generally required to include in income the foreign subsidiary's earnings and profits. However, petitioners were able to avoid this exception and avoid gain or loss recognition because of temporary regulations in effect at that time. The temporary regulations allowed Sligo to elect to recog-

**[*43]** nize gain upon the deemed liquidation equal to either: (1) its built-in gain in its Epsolon stock or (2) Epsolon's earnings and profits attributable to Sligo. See sec. 1.367(b)-3T(b)(4)(i)(A), Temporary Income Tax Regs., supra. The election in the temporary regulations was available only for transactions that occurred between February 23, 2000, and February 23, 2001. See T.D. 8863, 2000-1 C.B. 488. At the time of Epsolon's partnership election, Sligo had no built-in gain on its Epsolon stock; Epsolon had $51,260,455 of earnings and profits. Sligo elected to recognize the built-in gain of zero upon the deemed liquidation. According to petitioners, the deemed liquidation of Epsolon did not result in taxable income to Epsolon or Sligo.

After the deemed liquidation, Sligo was deemed to contribute the eight options back to Epsolon as a newly formed partnership. See sec. 301.7701-3(g)(1)(ii), Proced. & Admin. Regs. According to petitioners, neither Epsolon nor Sligo recognized gain or loss upon Sligo's deemed contribution of the options to Epsolon. See sec. 721(a). Epsolon calculated its basis in the newly contributed options pursuant to section 723 and received a carryover basis in the options; and Sligo calculated its basis in its Epsolon partnership interest pursuant to sections 722 and 755. Petitioners calculated Sligo's adjusted basis in its Epsolon partnership interest as Sligo's basis in the long options, subtracting the liability on

[*44] the short options assumed by Epsolon.  See sec. 752(a).  After the partnership election on December 26, 2000, Epsolon closed out four of the remaining options for a net loss of over $38 million plus over $1 million in transaction costs on December 28, 2000, and let the other four options expire, unexercised, on January 8, 2001.  Epsolon characterized the net loss on the December 28, 2000, disposition of the four options as U.S. source.

Through the above application of the mechanical rules of the Code and the regulations, Mr. Tucker did not recognize the gain on the offsetting gain legs of the Epsolon options but recognized the loss on the loss legs to offset his income on his WR stock options.  In this way, Epsolon separated the gain and loss legs of the Epsolon options.  Petitioners argue that both the loss and the gain were bona fide, and the Code treats them differently.

### B.    Sligo LLC Basis Component

As outlined above, the Epsolon loss passed through to Mr. Tucker's S corporation Sligo and then to Mr. Tucker.  To take advantage of the loss, he needed to have a sufficient basis in his Sligo stock.  He created a stock basis through a second set of offsetting foreign currency options (Sligo LLC basis component).  Petitioners have conceded that Mr. Tucker is not entitled to the basis

**[*45]** in his Sligo stock created through the Sligo LLC options. We summarize the Sligo LLC basis component below.

### 1. S Corporation Basis Adjustment Rules

Pursuant to section 1366(a), S corporation shareholders take into account their pro rata shares of passthrough S corporation income, losses, deductions, or credits in calculating their tax liabilities. When an S corporation incurs losses, the S corporation shareholders can directly deduct their shares of the S corporation losses on their individual returns in accordance with the S corporation passthrough rules. However, section 1366(d)(1) limits the amount of passthrough losses and deductions that a shareholder may claim. The amount of losses cannot exceed the shareholder's adjusted basis in the S corporation stock plus the adjusted basis of any debt owed to the shareholder by the corporation. Sec. 1366(d)(1). This limitation is imposed to disallow a deduction that exceeds the shareholder's economic investment in the S corporation. Disallowed passthrough loss deductions carry forward indefinitely and may be claimed to the extent that the shareholder increases his or her stock basis in the S corporation. Sec. 1366(d)(2).

S corporation shareholders must make various adjustments to their bases in their S corporation stock. S corporation shareholders increase their bases in S corporation stock by their pro rata shares of income and by capital contributions

**[\*46]** and decrease their bases by losses and deductions passed through to the shareholders. Secs. 1012, 1367. A shareholder may increase his or her stock basis if he or she makes an economic outlay to or for the benefit of the S corporation. Underwood v. Commissioner, 63 T.C. 468, 477 (1975) aff'd, 535 F.2d 309 (5th Cir. 1976); see Goatcher v. United States, 944 F.2d 747, 751 (10th Cir. 1991); Estate of Leavitt v. Commissioner, 875 F.2d 420, 422 (4th Cir. 1989), aff'g 90 T.C. 206 (1988). An economic outlay is an actual contribution of cash or property by the shareholder to the S corporation. Estate of Leavitt v. Commissioner, 875 F.2d at 422.

### 2. Sligo LLC Basis Computation

To take advantage of the Epsolon losses, Mr. Tucker had to sufficiently inflate his basis in his Sligo stock. To this end, he purported to establish the necessary basis through offsetting yen options. Through Sligo LLC he bought and sold put options with premiums of $51 million and $50.49 million, respectively, and then contributed the options to Sligo by transferring his ownership in Sligo LLC to Sligo. Mr. Tucker calculated his Sligo stock basis by increasing his basis for the $51 million premium purportedly paid for the long yen option. However, he did not decrease his stock basis for the offsetting $50.49 million premium purportedly received for the short yen option on the basis that his obligation to

**[*47]** fulfill the short yen option was a contingent liability that did not reduce his stock basis under section 358(a) and (d). Mr. Tucker also increased his stock basis by a purported cash contribution of $2,024,700. Thus, Mr. Tucker claimed a basis in Sligo stock of $53,024,700. The basis computation above would have given him a sufficient basis in his Sligo stock to claim the Epsolon passthrough losses on his individual income tax return. Petitioners have conceded the $51 million basis increase from the premium paid for the yen option and now seek to recognize Epsolon losses to the extent they can establish a basis in Sligo through cash contributions and carry over the remaining Epsolon losses to future years.

II.    Mechanical Application of the Code and Application of the Economic Substance Doctrine

Petitioners argue that the Code and the regulations mandate the above treatment of the gain and loss on the Epsolon options, and accordingly they are entitled to deduct the loss from the Epsolon options to the extent of Mr. Tucker's basis in Sligo. They argue that Congress chose not to tax the gain realized on the Epsolon options while Epsolon was a CFC for less than 30 days and chose to allow the loss realized while Epsolon was a U.S. partnership. They urge the Court to give effect to the statute as written and the regulatory choices made by the Secretary. They argue that Congress purposefully taxed U.S. shareholders of

[*48] CFCs only when the entities are CFCs for 30 days or more. Sec. 951(a)(1). In addition, petitioners argue that during the limited period relevant here, regulations allowed a parent company with a foreign subsidiary to elect to recognize gain equal to either (1) the parent's built-in gain in the subsidiary's stock or (2) the foreign subsidiary's earnings and profits. Sec. 1.367(b)-3T(b)(4)(i)(A), Temporary Income Tax Regs., supra. By having Epsolon in existence as a CFC for less than 30 days, filing a partnership election, and electing to recognize built-in gain once Epsolon became a U.S. partnership, petitioners suggest that Mr. Tucker used the Code provisions as Congress intended to effectively avoid recognizing a purported $51 million gain. Petitioners, however, cite no legislative, regulatory, or other authority indicating that Congress intended such a result. Rather, legislative history and congressional intent contradict petitioners' argument. The 30-day CFC rule of section 951(a) is a linchpin of the FX transaction. Section 951 taxes U.S. shareholders of a CFC currently on their pro rata shares of certain types of CFC earnings. The legislative history states that the subpart F regime, which includes the 30-day rule under section 951(a), was "designed to end tax deferral on 'tax haven' operations by U.S. controlled corporations." S. Rept. No. 87-1881 (1962), 1962-3 C.B. 707, 785; see also H.R. Rept. No. 87-1447 (1962), 1962-3 C.B. 405, 462. It is clear that Congress neither

**[\*49]** contemplated nor intended to encourage this type of mechanical manipulation of the rules when enacting these international tax provisions. The courts have rejected a mechanical or formalistic compliance with the rules of subpart F. Garlock, Inc. v. Commissioner, 58 T.C. 423 (1972), aff'd, 489 F.2d 197 (2d Cir. 1973); see Estate of Weiskopf v. Commissioner, 64 T.C. 78 (1975); Kraus v. Commissioner, 59 T.C. 681 (1973), aff'd, 490 F.2d 898 (2d Cir. 1974); Barnes Grp. Inc. v. Commissioner, T.C. Memo. 2013-109 (considering substance over form doctrine with respect to the subpart F regime). The "mere technical compliance with the statute [subpart F] is not sufficient." Kraus v. Commissioner, 59 T.C. at 692. On multiple occasions, the courts have considered both the terms and intent of the subpart F provisions and held U.S. shareholders were subject to income inclusion and tax under subpart F consistent with the substance of the transactions rather than their form.[9]

Petitioners' argument that Congress and the Secretary approved of Mr. Tucker's use of the check-the-box partnership election to allow a loss deduction

---

[9]Sec. 988 does not preclude our application of the economic substance doctrine. See Stobie Creek Invs. LLC v. United States, 608 F.3d 1366 (Fed. Cir. 2010). Sec. 988 provides that foreign currency gain or loss shall be computed separately and treated as ordinary income or loss. Respondent relies on sec. 988 as an alternative argument for treating the Epsolon options as a single economic position. We do not address this argument as we find the FX transaction lacked economic substance.

**[\*50]** also contradicts legislative history. At the time of the promulgation of the partnership check-the-box regulations, there was a concern that taxpayers might use the partnership check-the-box election, as here, in an attempt to achieve results that are inconsistent with legislative intent. The explanation of the provisions in the preamble to T.D. 8697, 1997-1 C.B. 215, 216, which promulgated the check-the-box regulations, states:

> As stated in the preamble to the proposed regulations, in light of the increased flexibility under an elective regime for the creation of organizations classified as partnerships, Treasury and the IRS will continue to monitor carefully the uses of partnerships in the international context and will take appropriate action when partnerships are used to achieve results that are inconsistent with the policies and rules of particular Code provisions or of U.S. tax treaties.

Mr. Tucker used the partnership election to ignore economic reality and to separate Epsolon's gains from its losses--a critical step in his prearranged transaction. This manipulation of the elective regime for creating a partnership is patently inconsistent with legislative intent and is a prime example of the kind of behavior that concerned the regulators when the flexible check-the-box rules were promulgated. The offsetting Epsolon option spreads, the splitting of the gain and loss legs through the check-the-box partnership scheme, and the election under section 1.367(b)-3T(b)(4)(i)(A), Temporary Income Tax Regs., supra, assured that Mr. Tucker would have the loss he needed to offset his WR stock option income

**[\*51]** without the need to recognize the offsetting gain on the options.  Petitioners

lack any support for their argument that Congress intended to permit Mr. Tucker

to claim tax deductions equal to  more than 75 times the amount of his actual

economic loss.

Petitioners cite two 50-year-old cases from the Court of Appeals for the

First Circuit in support of their position that we should respect the mechanical

application of the Code and the regulations used to achieve the tax-avoidance

strategy in the FX transaction, Fabreeka Prods. Co. v. Commissioner, 294 F.2d

876 (1st Cir. 1961), vacating and remanding 34 T.C. 290 (1960), and Granite Tr.

Co. v. United States, 238 F.2d 670 (1st Cir. 1956).  In both cases, the Court of

Appeals refused to apply judicial antiabuse doctrines despite the taxpayers' clear

tax-avoidance motives.  Both Fabreeka and Granite Tr. are readily distinguishable

on their facts and with respect to the intent of the relevant Code provisions.[10]

---

[10]In Fabreeka Prods. Co. v. Commissioner, 294 F.2d 876 (1st Cir. 1961), vacating and remanding 34 T.C. 290 (1960), a corporation purchased bonds at a premium in part with loans, deducted the amortized bond premium as allowed by the Code, and distributed the bonds as a dividend, which the shareholders resold for substantially the same premium paid by the corporation.  In effect the corporation claimed a deduction for amounts distributed as dividends.  In Granite Tr. Co. v. United States, 238 F.2d 670 (1st Cir. 1956), a corporation disposed of stock in a wholly owned corporation and then liquidated, thereby avoiding nonrecognition of gain or loss upon a complete liquidation of a subsidiary by an 80% corporate shareholder.  See sec. 112(b)(6), I.R.C. 1939.  The cases' continued

(continued...)

[*52] Neither case considers the requirements of the economic substance doctrine as established by the Court of Appeals for the Fifth Circuit and discussed below. In the Fifth Circuit judicial antiabuse principles are imposed to prevent taxpayers from subverting legislative purpose by claiming tax benefits from transactions that are fictitious or lack economic reality. The Court of Appeals has stated:

> The judicial doctrines empower the federal courts to disregard the claimed tax benefits of a transaction--even a transaction that formally complies with the black-letter provisions of the Code and its implementing regulations--if the taxpayer cannot establish that "what was done, apart from the tax motive, was the thing which the statute intended."

Southgate Master Fund, 659 F.3d at 479 (fn. ref. omitted) (quoting Gregory v. Helvering, 293 U.S. 465, 469 (1935)). Petitioners have offered nothing to indicate that Congress intended to provide the tax benefits they seek through the formal application of the Code and the regulations without conforming to economic reality. Accordingly we consider the economic reality of the options at issue.

---

[10](...continued)
validity in relation to the economic substance doctrine has been questioned as both cases apply a rigid two-part test that invalidates a transaction only if it lacks economic substance and the taxpayer's sole motivation was tax avoidance. See Fid. Int'l Currency Advisor A Fund, LLC v. United States, 747 F. Supp. 2d 49 (D. Mass. 2010), aff'd, 661 F.3d 667 (1st Cir. 2011). The Court of Appeals for the Fifth Circuit uses a conjunctive three-part test for the economic substance doctrine. Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States, 568 F.3d 537 (5th Cir. 2009).

**[\*53]** III.    <u>Economic Substance Doctrine</u>

Taxpayers generally are free to structure their business transactions as they wish even if motivated in part by a desire to reduce taxes. <u>Gregory v. Helvering</u>, 293 U.S. at 469. The economic substance doctrine, however, permits a court to disregard a transaction--even one that formally complies with the Code--for Federal income tax purposes if it has no effect other than on income tax loss. <u>See</u> <u>Knetsch v. United States</u>, 364 U.S. 361 (1960); <u>Southgate Master Fund</u>, 659 F.3d at 479. We will respect a transaction when it constitutes a genuine, multiparty transaction, compelled by business or regulatory realities, with tax-independent considerations that are not shaped solely by tax-avoidance features. <u>Frank Lyon Co. v. United States</u>, 435 U.S. 561, 583-584 (1978). Whether a transaction has economic substance is a factual determination. <u>United States v. Cumberland Pub. Serv. Co.</u>, 338 U.S. 451, 456 (1950). Generally, the taxpayer has the burden of proving that the Commissioner's determinations in a notice of deficiency are incorrect. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). It is well settled that "an income tax deduction is a matter of legislative grace," and the taxpayer generally bears the burden of showing his entitlement to a claimed deduction. <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992).

[*54] Accordingly, the burden of proving economic substance rests on the taxpayer. See Coltec Indus., Inc., 454 F.3d at 1355-1356 & n.15.

The Courts of Appeals are split as to the application of the economic substance doctrine.[11] An appeal in this case would lie to the Court of Appeals for the Fifth Circuit absent a stipulation to the contrary and, accordingly, we follow the law of that circuit. See Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971). The Court of Appeals for the Fifth Circuit has interpreted the economic substance test as a conjunctive "multi-factor test". Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States, 568 F.3d 537, 544 (5th Cir. 2009). In Klamath, the Court of Appeals stated that a

---

[11]Some Courts of Appeals require that a valid transaction have either economic substance or a nontax business purpose. See, e.g., Horn v. Commissioner, 968 F.2d 1229, 1236-1238 (D.C. Cir.1992), rev'g Fox v. Commissioner, T.C. Memo. 1988-570; Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 91 (4th Cir. 1985), aff'g in part, rev'g in part 81 T.C. 184 (1983). Other Courts of Appeals require that a valid transaction have both economic substance and a nontax business purpose. See Dow Chem. Co. v. United States, 435 F.3d 594, 599 (6th Cir. 2006); Winn-Dixie Stores, Inc. & Subs. v. Commissioner, 254 F.3d 1313, 1316 (11th Cir. 2001), aff'g 113 T.C. 254 (1999). Still other Courts of Appeals adhere to the view that a lack of economic substance is sufficient to invalidate a transaction regardless of the taxpayer's subjective motivation. See, e.g., Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1355 (Fed. Cir. 2006). And still other Courts of Appeals treat the objective and subjective prongs merely as factors to consider in determining whether a transaction has any practical economic effects beyond tax benefits. See, e.g., ACM P'ship v. Commissioner, 157 F.3d 231, 248 (3d Cir. 1998), aff'g in part, rev'g in part T.C. Memo. 1997-115.

**[\*55]** transaction will be respected for tax purposes only if: (1) it has economic substance compelled by business or regulatory realities; (2) it is imbued with tax-independent considerations; and (3) it is not shaped totally by tax avoidance features. Id. at 544. Thus, the transaction must exhibit an objective economic reality, a subjectively genuine business purpose, and some motivation other than tax avoidance. Southgate Master Fund, 659 F.3d at 480. Failure to meet any one of these three factors renders the transaction void for tax purposes. Klamath, 568 F.3d at 544. While Klamath phrases the economic substance doctrine as a conjunctive, three-factor test, the Court of Appeals for the Fifth Circuit has recognized that "there is near-total overlap between the latter two factors. To say that a transaction is shaped totally by tax-avoidance features is, in essence, to say that the transaction is imbued solely with tax-dependent considerations." Southgate Master Fund, 659 F.3d at 480 & n.40. The proper focus of the economic substance doctrine is the particular transaction that gave rise to the tax benefit at issue, not collateral transactions that do not produce tax benefits. Klamath, 568 F.3d at 545. For the reasons discussed below, we find that the Epsolon option transactions fail the economic substance doctrine as set forth by the Court of Appeals for the Fifth Circuit.

**[*56]**  A.  Objective Economic Inquiry

Under the objective economic inquiry of Klamath, a transaction lacks economic reality if it does not vary, control, or change the flow of economic benefits.  Southgate Master Fund, 659 F.3d at 481.  The objective economic inquiry asks whether the transaction affected the taxpayer's financial position in any way, i.e. whether the transaction "either caused real dollars to meaningfully change hands or created a realistic possibility that they would do so."  Id. at 481 & n.41.  Stated differently, the test for objective economic reality is whether there is a reasonable possibility of making a profit apart from tax benefits.  Id. at 481 n.43.  The inquiry is based on the vantage point of the taxpayer at the time the transactions occurred rather than with the benefit of hindsight.  Id. at 481.

Petitioners argue that the Epsolon options materially changed the taxpayer's economic position.  Petitioners further argue that Mr. Tucker had a reasonable possibility of making a profit.  He could have earned $487,707 profit net of fees if both the Epsolon and Sligo LLC options had been profitable, which petitioners argue reflects a reasonable possibility of profit sufficient to satisfy the objective economic inquiry as articulated by the Court of Appeals for the Fifth Circuit.  Petitioners contend that Mr. Tucker had a 40% probability of earning a $1,458,999 profit on the Epsolon options and a 40% probability of earning a $558,708 profit

**[\*57]** on the Sligo LLC options for a total profit of $2,017,707 and a net profit of $487,707 after payment of KPMG's and Helios' fees. Petitioners argue this amount represents a large profit because it represents a 14% return over a short period. The parties substantially agree on the amount and probability of Mr. Tucker's profit potential from the Sligo LLC and Epsolon options. At the time of the FX transaction, Mr. Tucker also understood that the Sligo LLC options and Epsolon options each had a 40% chance of profitability. Respondent notes that Mr. Tucker needed to profit on both components to realize a net profit on the total FX transaction to cover the nearly $1.5 million in fees that Mr. Tucker paid to KPMG and Helios. Respondent argues that probability that both events would occur could have been as low as 16%. Mr. Fong acknowledged that the likelihood of profit on both components was between 16% and 40%, depending upon the extent to which there was a correlation between the two events. Neither party's expert provided testimony of the appropriate correlation, however.

### 1. Reasonable Possibility for Profit

The possibility of making any profit is not presumptively sufficient to show a reasonable possibility of profit. The existence of "some potential for profit" is not necessarily sufficient to establish economic substance. Keeler v. Commissioner, 243 F.3d 1212, 1219 (10th Cir. 2001), aff'g T.C. Memo. 1999-18.

**[*58]** A transaction lacks objective economic substance if it does not "appreciably affect * * * [a taxpayer's] beneficial interest except to reduce his tax." Knetsch, 364 U.S. at 366 (quoting Gilbert v. Commissioner, 248 F.2d 399, 411 (2d Cir. 1957) (Hand, J., dissenting)). A de minimis economic effect is insufficient. Id. at 365-366 (finding a transaction involving leveraged annuities to be a sham because possible $1,000 cash value of annuities at maturity was "relative pittance" compared to purported value of annuities). Respondent argues that Mr. Tucker did not have a reasonable probability of profit because the potential profit of $487,707 as outlined above was not reasonable when compared with his $20 million tax savings from the FX transaction over 2000 and 2001. Petitioners argue that we should not compare profit potential with tax benefits for purposes of the economic substance doctrine and that we should independently consider Mr. Tucker's opportunity to earn a profit. We have previously compared potential profit with tax savings in assessing economic substance. Reddam v. Commissioner, 755 F.3d 1051, 1061 (9th Cir. 2014), aff'g T.C. Memo. 2012-106; Sala v. United States, 613 F.3d 1249, 1254 (10th Cir. 2010); Gerdau Macsteel, Inc. v. Commissioner, 139 T.C. 67, 174 (2012); Humboldt Shelby Holding Corp. & Subs. v. Commissioner, T.C. Memo. 2014-47, aff'd, 606 F. App'x 20 (2d Cir. 2015). Thus, when analyzing the objective economic substance of a transaction, it

**[*59]** is appropriate to view the reasonableness of the profit potential in the light of the expected tax benefits.

The Epsolon options gave rise to $52.9 million in tax losses over two years, 2000 and 2001, with petitioners claiming a $38 million loss for 2000 and a tax benefit of over $20 million for 2000 and 2001. The $487,707 potential profit is de minimis as compared to the expected $20 million tax benefit. Petitioners' claimed tax loss has no meaningful relevance to the minimal profit potential of $487,707 from the FX transaction. This amount is insignificant when compared to petitioners' $52.9 million in ordinary losses for 2000 and 2001 from the FX transaction and when compared to petitioners' tax savings of $20 million manufactured by the FX transaction for 2000 and 2001. Petitioners' tax savings for 2000 alone were $15.5 million. By any objective measure, the FX transaction defied economic reality. See Sala v. United States, 613 F.3d at 1254 (potential to earn $550,000 profit was dwarfed by expected tax benefit of nearly $24 million); Humboldt Shelby Holding Corp. & Subs. v. Commissioner, at *16 (potential profit of $510,000 was inconsequential compared to the $25 million tax benefit generated by the digital options); Blum v. Commissioner, T.C. Memo. 2012-16, slip op. at 35 (a 19.1% chance at realizing a $600,000 profit and a 7.6% chance of realizing a $3 million profit, were de minimis when compared to losses of over

[*60] $45 million), aff'd, 737 F.3d 1303 (10th Cir. 2013). Thus, it is evident that the Epsolon options, viewed objectively, offered no reasonable expectation of any appreciable net gain but rather were designed to generate artificial losses by gaming the tax code. Accordingly, the Epsolon options fail the objective prong of the economic substance analysis.

Petitioners suggest that we ascertain profitability by considering only the Epsolon options on the basis of their concession with respect to the Sligo LLC basis component. Petitioners contend that a comparison of the profit potential and the tax benefit of only the Epsolon options shows that the profits and the tax savings are sufficiently aligned to establish that the Epsolon options had economic substance. Petitioners contend that with their concession, they are entitled to a loss deduction of approximately $2 million for 2000, which results in tax savings of roughly $800,000 for 2000. However, petitioners misstate the effect of their concession as they seek to carry over the remainder of the 2000 $38 million loss to future years to the extent that they can establish Mr. Tucker's Sligo stock basis. Petitioners further argue that we should recalculate the profit potential on the Epsolon options by allocating the $1.5 million in fees paid to KPMG and Helios equally between the Epsolon and Sligo LLC components. Under this calculation, petitioners assert that Mr. Tucker would have a profit potential of $688,090 on the

[*61] Epsolon options, which represents a 30% return over a 19-day period. Petitioners argue that Mr. Tucker's potential profit is "substantial" compared to the $800,000 of tax savings petitioners claim for 2000, ignoring their carryover of the 2000 loss.

In assessing the economic substance of a transaction, we consider the transaction that gave rise to the tax benefit and not collateral transactions that do not produce tax benefits. Klamath, 568 F.3d at 545. The collateral transactions in Klamath were investments made with actual capital contributions to the partnership at issue which did not provide the tax benefits at issue. Id. The court in Klamath refused to consider the profitability of these investments in its analysis of the economic substance doctrine on the basis that the tax savings arose from an inflated partnership basis and euro purchased and distributed by the partnership. Id. Southgate Master Fund also involved two transactions (acquisition of nonperforming loans and the creation of a partnership) where the Court of Appeals for the Fifth Circuit considered which transaction created the tax savings at issue. The case involved the tax treatment of losses claimed through a partnership. The partnership's acquisition of nonperforming foreign loans resulted in more than $1 billion in losses. Southgate Master Fund, 659 F.3d at 468. The court found that despite the losses, the acquisition of the loans had economic substance. The

**[\*62]** investors prepared market research and a valuation analysis before acquiring the loans, and the acquisition was within the partners' core business of acquiring distressed debt. Id. at 469-470. The court found that the losses were unforeseeable and that a reasonable possibility of profit existed for the loans. Id. at 481. For purposes of the economic substance doctrine, the Government sought to compare the profit potential from the nonperforming loans with the tax savings from the partnership structure. The court refused to make such a comparison as the court would not combine its analysis of the loan acquisition and the partnership structure. The court found that the partners would have acquired the loans even if they had not received any tax benefits. Id. at 482. In fact one partner invested in the loans without any expectation or receipt of tax benefits. Id. The court found that the partnership was a sham, however, finding that the partnership was created to generate artificial losses and tax benefits. The court recharacterized the acquisition of the nonperforming loans as a direct sale to the individual partners, compared the profit potential from the nonperforming loans and the tax benefits from a direct sale, and found the tax benefits (from real, out-of-pocket expenses) were not disproportionate to the expected profitability. Id. at 483.

Petitioners' argument that we should ignore the Sligo LLC basis component fails for two reasons. First, the theory that we should wholly disregard one

[*63] abusive component merely because it was conceded to be abusive does not imbue the other equally abusive component with economic substance. To do so would contravene the core purpose of the economic substance doctrine to give effect to economic realities. Second, if we were to disregard the basis-inflation component, we would also disregard the 40% probability of earning a $558,708 profit associated with it, thus effectively wiping out any profit potential unless we agree with petitioners' reallocation of fees on a 50-50 basis. Such a reallocation of fees is not warranted as the fees related to the entire FX transaction. Mr. Tucker would have had to profit on both the Epsolon and Sligo LLC option spreads to cover the $1.5 million in fees paid to KPMG and Helios for the FX transaction. Both the Sligo LLC and Epsolon loss components were essential to achieve the mitigation of Mr. Tucker's 2000 income tax from the WR stock options. Mr. Tucker would not have executed the Epsolon options separate from the Sligo LLC options. Cf. Southgate Master Fund, 659 F.3d 466. The two components were interrelated, and Mr. Tucker depended on the Sligo LLC basis component in his decision to proceed with Epsolon loss component. See Winn-Dixie Stores, Inc. & Subs. v. Commissioner, 113 T.C. 254, 280 (1999), aff'd, 254 F.3d 1313 (11th Cir. 2001). The Court considers "the transaction in its entirety, rather than focusing

**[\*64]** only on each individual step." Reddam v. Commissioner, T.C. Memo. 2012-106, slip op. at 42, aff'd, 755 F.3d 1051 (9th Cir. 2014).

### 2. Actual Economic Effect

Tax losses that fail to correspond to any actual economic losses "do not constitute the type of 'bona fide' losses that are deductible" for Federal tax purposes. ACM P'ship v. Commissioner,157 F.3d 231, 252 (3d Cir. 1998), aff'g in part, rev'g in part T.C. Memo. 1997-115. "[T]he mere presence of potential profit does not automatically impart substance where a commonsense examination of the transaction and the record * * * reflect a lack of economic substance." John Hancock Life Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. 1, 79 (2013) (citing Sala v. United States, 613 F.3d 1249, 1254 (10th Cir. 2010)); see Keeler v. Commissioner, 243 F.3d at 1219. Mr. Tucker experienced a net economic loss of approximately $695,000 on the FX transaction. However, this economic loss did not cause real dollars to meaningfully change hands to the extent of the claimed tax losses of $52.9 million for 2000 and 2001 or the claimed tax loss of $38 million for 2000. See Southgate Master Fund, 659 F.3d at 481. Mr. Tucker should have expected to lose money on the FX transaction; he knew there was a 60% chance that each component would result in an economic loss. Yet his potential for economic loss was severely limited, $1,488, 985 and $510,000 on the

[*65] Epsolon and Sligo LLC options, respectively, when compared to his claimed tax losses. This expected loss was part of the cost of engaging in the FX transaction to achieve the desired tax savings and was not intended to change Mr. Tucker's financial position. Had the Epsolon options resulted in a profit, the claimed artificial loss would have remained for petitioners to claim on their tax return. The artificial $39 million loss for 2000 is unrelated to the $487,707 in profit potential or the actual $695,000 economic loss that Mr. Tucker sustained.

The economics of the FX transaction do not support petitioners' claim to the losses reported on their 2000 tax return. There were four possible outcomes for the two sets of option transactions:

(1)     Epsolon option transactions finished in-the-money; Sligo LLC option transactions finished in-the-money;

(2)     Epsolon option transactions finished in-the-money; Sligo LLC option transactions finished out-of-the-money;

(3)     Epsolon option transactions finished out-of-the-money; Sligo LLC option transactions finished out-of-the-money; or

(4)     Epsolon option transactions finished out-of-the-money; Sligo LLC option transactions finished in-the-money.

The parties rely on the economic analyses of their respective experts in support of their positions concerning the options' economic effect. Both experts agree that Mr. Tucker could profit only under the fourth outcome, and only to the

[*66] extent of $487,707 after accounting for fees.  The other three outcomes would result in an economic loss.  Both experts also used the Black Scholes Merton option pricing formula, but respondent's expert, using Mr. Fong's price determinations for the individual legs of the spread positions, concluded that the options were mispriced against Mr. Tucker.  Mr. Fong did not price the spreads as a whole, however.  Petitioners dispute that the options were mispriced.

Mr. Fong determined, and Dr. DeRosa agreed, that there was an approximately 40% likelihood that the Epsolon option transactions would finish out-of-the-money and an approximately 40% chance that the Sligo LLC option transactions would finish in-the-money, both events were necessary for Mr. Tucker to make the$487,707 profit, and the likelihood that both events would occur would fall between 16% and 40%.  Petitioners argue that we should not consider the 60% likelihood that Mr. Tucker would lose money because Mr. Tucker did not consider the FX transaction from a loss perspective.  Rather he considered only that he had a 40% chance of making a profit and could earn that profit over a short period.  To this end, Mr. Tucker acknowledged he knew the options were riskier than his typical investments.

Dr. DeRosa also analyzed the expected rate of return of the FX transaction and the probability-weighted sum of the four possible outcomes, and he calculated

[*67] that Mr. Tucker had a negative expected rate of return on both the Epsolon and Sligo LLC option transactions, before and after accounting for fees. Dr. DeRosa determined that Mr. Tucker's expected rates of return for the Epsolon and Sligo LLC options were –54.90% and –52.39%, respectively, after accounting for fees. Dr. DeRosa explained that the expected rate of return analysis is a fundamental tool in assessing the economics of the options because it accounts for investment costs, possible payoffs, and probabilities of those payoffs. Dr. DeRosa explained that an expected rate of return is indicative of whether an option is priced correctly and the large negative expected rates of return present in this case indicate that the options were "egregiously" mispriced against Mr. Tucker. Petitioners argue that the expected rate of return analysis is not relevant to the objective test of the economic substance doctrine because such an analysis fails to address whether the options had profit potential. At times, courts have found that negative expected rates of return indicate a lack of reasonable possibility of profit while at other times courts have given little weight to such analyses. See Stobie Creek Invs., LLC v. United States, 608 F.3d 1366, 1378 (Fed. Cir. 2012); Reddam v. Commissioner, T.C. Memo. 2012-106; Blum v. Commissioner, T.C. Memo. 2012-16; Fid. Int'l Currency Advisor A Fund, LLC v. United States, 747 F. Supp. 2d 49, 196 (D. Mass. 2010), aff'd, 661 F.3d 667 (1st Cir. 2011). The extent to

[*68] which a given analysis is instructive depends heavily on the facts of the transaction in question. Significantly mispriced assets can indicate a lack of economic substance. <u>Reddam v. Commissioner</u>, T.C. Memo. 2012-106; <u>Blum v. Commissioner</u>, T.C. Memo. 2012-16.

We have found that the FX transaction lacked profit potential on the basis of a comparison of the minimal profit potential with the $52 million in tax savings over two years. Accordingly, we do not need to rely on Dr. DeRosa's expected rate of return analysis. For the most part, both expert reports are in agreement and use the same mathematical model and inputs. The reports, however, diverge in two key respects. First, as explained above, Dr. DeRosa relies on an expected rate of return analysis, and Mr. Fong determined profit probability. Second, the experts disagree on how to interpret each options' value. The experts agree that the stated premium of each individual option was generally within 1% of its theoretical value. That is, each option, valued independently, was traded at or near market price at the time the trades occurred. Dr. DeRosa's rebuttal report, however, explains that the appropriate value to examine is the net premium paid or received, relative to the theoretical value of the position, to determine whether the FX transaction was fairly priced. While not determinative, a mispriced asset can contribute to the overall picture of a transaction lacking in economic substance.

**[*69]** See Blum v. Commissioner, slip op. at 37-38. Using Mr. Fong's valuation calculations, Dr. DeRosa compared a market-valued net premium of $2,212,125[12] for the Epsolon euro options with the net premium of $1,458,999 payable by Lehman Brothers to Epsolon. Dr. DeRosa determined that the amount payable to Epsolon was 34% less than Mr. Fong's value, or rather, Lehman Brothers underpaid Mr. Tucker by $753,126.

Between the 60% or greater likelihood that Mr. Tucker would lose money on the options, the large negative expected rate of return, and the mispricing of the options, the expert reports indicate that the Epsolon options were expected to, and did in fact, generate an economic loss. Mr. Tucker made a minimal cash outlay, had limited financial risk, and incurred an actual economic loss of roughly $695,000, which stands in stark contrast to the claimed loss of $52.9 million over two years. Viewed objectively, the Epsolon loss component was not designed to make a profit, but rather arranged to produce a $52.9 million artificial loss. The scheme involved separating the gains from the losses by allocating the gains to Epsolon while it was a CFC, checking the box to become a partnership,

---

[12]Dr. DeRosa believes that Mr. Fong's calculation contains a simple mathematical error and the correct value should be $2,388,167. If that error were corrected, the difference between the market-valued net premium and the net premium payable would increase to 39%.

[*70] subsequently recognizing the losses, and creating a tiered passthrough-entity structure through which to claim the artificial losses. No element of the Epsolon loss and Sligo LLC basis components had economic substance; each was orchestrated to serve no other purpose than to provide the structure through which petitioners could reduce their 2000 and 2001 tax burden. Accordingly, because the Epsolon option transaction lacked objective economic substance, it is void for tax purposes. See Klamath, 568 F.3d at 544 (to have economic substance a transaction must satisfy three factors). Failure to satisfy the objective economic realities inquiry is sufficient to void the Epsolon options for tax purposes. For the sake of thoroughness, we will examine whether petitioners satisfy the subjective inquiries of business purpose and nontax motivation.

B.     Subjective Business Purpose Inquiry

The second and third Klamath factors, while enumerated separately, overlap and derive from the same subjective inquiry of a subjectively genuine business purpose or some motivation other than tax avoidance. Southgate Master Fund, 659 F.3d at 481. Accordingly we address the two factors together. Taxpayers are not prohibited from seeking tax benefits in conjunction with seeking profits for their businesses. Id. Taxpayers who act with mixed motives of profits and tax benefits can satisfy the subjective test. Id. at 481-482. For purposes of the

[*71] subjective inquiry, tax-avoidance considerations cannot be the taxpayer's sole purpose for entering into a transaction. Salty Brine I, Ltd. v. United States, 761 F.3d 484, 495 (5th Cir. 2014). That a taxpayer enters into a transaction primarily to obtain tax benefits does not necessary invalidate the transaction under the subjective inquiry. Compaq Comput. Corp. & Subs. v. Commissioner, 277 F.3d 778, 786 (5th Cir. 2001), rev'g 113 T.C. 214 (1999). However, "[t]he existence of a relatively minor business purpose will not validate a transaction if 'the business purpose is no more than a façade'." Humboldt Shelby Holding Corp. & Subs. v. Commissioner, at *16 (quoting ASA Investerings P'ship v. Commissioner, 201 F.3d 505, 513 (D.C. 2000), aff'g T.C. Memo. 1998-305).

Respondent asserts that Mr. Tucker engaged in the FX transaction for the sole purpose of avoiding income tax that he owed upon the exercise of his WR stock options. Petitioners counter that Mr. Tucker's admitted desire for tax savings does not negate his other motivations for entering into the FX transaction --profit and diversification. Petitioners claim Mr. Tucker's primary motivation was profit. In an effort to show his profit motives petitioners characterize Mr. Tucker's investment in the FX transaction as relatively small and describe the 40% chance of profit as very substantial and the $487,707 profit potential amount as very large over a short period. On brief, petitioners analogize Mr. Tucker's tax

[*72] strategy to a double bacon cheeseburger--equating the $20 million expected tax benefits to the two hamburger patties and the $487,707 profit potential to the bacon--and urge us to believe that he "bought it for the bacon." The record, however, indicates otherwise.

Mr. Tucker did not implement the options for a genuine business purpose. Rather he entered into the Epsolon options for the sole purpose of reducing his income tax. Mr. Tucker's efforts to participate in other tax strategies before ultimately engaging in the FX transaction, including the short options strategy before KPMG terminated the strategy upon the issuance of Notice 2000-44, supra, and the Quadra Forts transaction before its financing fell through, belie Mr. Tucker's claim that his motivations were anything other than tax savings. Mr. Tucker did not approach the FX transaction as a normal investment but rather approached it as a tax-avoidance strategy despite his extensive experience in the field of finance. Mr. Tucker, a former CEO of a publicly traded financial services company, attempts to portrait himself as an unsophisticated investor. For the FX transaction he relied entirely on the advice of his tax adviser, KPMG, without any review of his own into the investment potential of the Sligo LLC or Epsolon options. His interactions with KPMG cast doubt on his purported profit motivation for engaging in the FX transaction. KPMG approached Mr. Tucker in

**[\*73]** the spring of 2000 with the idea of a tax solution to mitigate the income tax from the anticipated exercise of the WR stock options. Mr. Tucker decided to pursue a short options strategy and then exercised his WR stock options on August 1, 2000. Shortly thereafter, the IRS issued Notice 2000-44, supra, and KPMG terminated its short options strategy. KPMG sought an alternative tax solution for Mr. Tucker, which also fell through in mid-December. At the 11th hour, Mr. Speiss sought approval from KPMG's tax leadership to create a customized tax solution for Mr. Tucker. Mr. Speiss sought assistance from Helios, Alpha, and DGI to orchestrate a tax solution that involved an elaborate array of steps, including newly created entities, tax elections, and the acquisition of offsetting foreign currency digital option spreads, for the sole purpose of generating a multimillion-dollar ordinary loss in the final two weeks of the tax year. KPMG arranged the FX transaction to ensure the amount of the generated tax losses would be sufficient to offset Mr. Tucker's income from the WR stock options. They completed the transaction in a short time during the final two weeks of the tax year for the purpose of avoiding taxes owed for that year, after two other failed attempts at tax-avoidance transactions.

Mr. Tucker's testimony attempts to put a positive spin on the economic realities of the transaction, testifying that he knew that the FX transaction was

[*74] riskier than his typical investments and that he sought to diversify into riskier investments.  In actuality, Mr. Tucker should have expected the investment to be a failure, as he knew that the Epsolon and Sligo LLC option transactions each had a 60% chance of losing money.  Mr. Tucker claims a diversification motive and made other investments of less than $5 million at the time of the FX transaction per KPMG's advice in an attempt to show his nontax profit motives.  However, the record shows that the purpose of those investments was to protect against IRS penalties and not to diversify.  Mr. Tucker's  additional investments do not imbue the FX transaction with tax-independent considerations.  Moreover, the Epsolon entity served no business purpose other than tax avoidance.  At the time he acquired Epsolon, Mr. Tucker did not intend to conduct any legitimate business or investment activities through Epsolon.  Epsolon was a shelf corporation established by tax shelter promoters.

Mr. Tucker's decision to enter into the FX transaction was solely tax motivated and did not have a genuine business purpose.  Regardless of his purported desire for profit and diversification, Mr. Tucker executed a transaction that was structured for tax savings and not to make a profit.  We note that even had petitioners established a nontax or genuine business purpose for the Epsolon options, such motivation would not have been sufficient to satisfy the conjunctive

**[*75]** factor test for economic substance as set forth by the Court of Appeals for the Fifth Circuit. The Epsolon options lacked any practical objective economic effect.

IV.    <u>Accuracy-Related Penalties</u>

Section 6662 provides that a taxpayer may be liable for a 20% penalty on the portion of an underpayment of tax attributable to (1) a substantial understatement of income tax, (2) negligence or disregard of rules or regulations, or (3) any substantial valuation misstatement. Sec. 6662(a) and (b)(1), (2), and (3). A "substantial valuation misstatement" occurs if the value of any property or the adjusted basis of any property claimed on an income tax return is 200% or more of the correct amount. Sec. 6662(e)(1)(A); sec. 1.6662-5(e)(1), Income Tax Regs. If the valuation misstatement is 400% or more of the correct amount, the misstatement is considered a gross valuation misstatement, and the 20% penalty increases to 40%. Sec. 6662(h). The section 6662 penalties do not apply if taxpayers demonstrate they acted with reasonable cause and in good faith. Sec. 6664(c)(1). In the deficiency notice, respondent determined in the alternative that petitioners are liable for the 20% and 40% accuracy-related penalties for negligence, a substantial understatement of income tax, a substantial valuation misstatement, or a gross valuation misstatement. There is no stacking of penalties.

[*76] Sec. 1.6662-2(c), Income Tax Regs. While more than one basis for the section 6662 penalty may exist, the maximum allowed penalty is 40%. Id.

The 40% gross valuation misstatement penalty would apply in this case on the basis of petitioners' claimed inflated basis in the Sligo stock. Sec. 6662(h)(2)(A). To allow for the Epsolon option losses to pass through Sligo to petitioners' 2000 tax return, Mr. Tucker had to establish a sufficient basis in his Sligo stock, which he did through a basis-inflation transaction using offsetting option positions in the Sligo LLC basis component which petitioners have since conceded. Mr. Tucker bought and sold yen put options through Sligo LLC with gross premiums of $51 million and $50,490,000, respectively, and then contributed these positions to Sligo by transferring his Sligo LLC ownership to Sligo. Mr. Tucker paid a net premium of only $510,000 on the yen options but claimed a stock basis of $51 million, the gross premium of the purchased yen put option. Mr. Tucker did not reduce his Sligo basis by the premium received for the sold yen put option, arguing that the sold yen put option was a contingent liability that did not reduce S corporation basis under section 358(a) and (d). Petitioners have conceded this issue and now maintain that Mr. Tucker's basis is limited to cash contributions he made to Sligo during 2000. Petitioners allege that amount to be $2,024,700. Even if we assume that Mr. Tucker had a basis in Sligo equal to

[*77] $2,024,700, his reported basis of $51 million exceeded that amount by more than 2,500%, far in excess of the 400% threshold required for the gross valuation misstatement penalty to apply.

Petitioners argue that they are not liable for the accuracy-related penalty because they acted with reasonable cause and in good faith in reporting their 2000 tax liability. We determine whether a taxpayer acted with reasonable cause and in good faith on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. A taxpayer's reliance on the advice of an independent professional may constitute reasonable cause and good faith. The advice must be based on all pertinent facts and circumstances and the law as it relates to those facts and circumstances and must not be based on any unreasonable factual or legal assumptions. Id. para. (c)(1). We have summarized the requirements for the reasonable reliance on professional advice as: (1) the professional is a competent tax adviser with sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98-99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). A taxpayer's education and business experience are relevant to the determination of whether the taxpayer acted with reasonable

**[\*78]** reliance on an adviser and in good faith. Sec. 1.6664-4(b)(1), Income Tax Regs. The Supreme Court recognized in United States v. Boyle, 469 U.S. 241, 251 (1985), that a taxpayer exercises "[o]rdinary business care and prudence" when he reasonably relies on a professional's advice on matters beyond the taxpayer's understanding.

A taxpayer need not challenge an independent and qualified adviser, seek a second opinion, or monitor advice on the provisions of the Code. Id. As the Supreme Court noted in Boyle: "Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney * * * would nullify the very purpose of seeking the advice of a presumed expert in the first place." Id. Advice need not be written and includes any communication that provides advice on which the taxpayer relied directly or indirectly. Sec. 1.6664-4(c)(2), Income Tax Regs. The most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. Id. para. (b). The focus of the reasonable cause defense is on the taxpayer's knowledge, not the adviser's knowledge. Southgate Master Fund, 659 F.3d at 494.

The reasonableness of any reliance depends on the quality and objectivity of the advice. Klamath, 568 F.3d at 548. Reliance on an adviser is not reasonable or

[*79] in good faith when the taxpayer knew or should have known that the adviser had an inherent conflict of interest. See Chamberlain v. Commissioner, 66 F.3d 729, 732-733 (5th Cir. 1995), aff'g in part, rev'g in part T.C. Memo. 1994-228; Paschall v. Commissioner, 137 T.C. 8, 22 (2011); Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98. Taxpayers cannot in good faith rely on the advice of a promoter of a tax shelter transaction. However, the definition of a promoter is not clear from case law. We have stated that a promoter is someone who participated in the structuring of the tax shelter transaction offered to numerous clients or otherwise has a financial interest or profits from the transaction. 106 Ltd. v. Commissioner, 136 T.C. 67, 80 (2011), aff'd, 684 F.3d 84 (D.C. Cir. 2012); Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121. An adviser is not a promoter when he has a long-term and continual relationship with the client-taxpayer, does not give unsolicited advice regarding the tax shelter, advises the client only within his field of expertise and not because of his regular involvement in the tax shelter transactions, follows his regular course of conduct in rendering his advice, and has no stake in the transaction besides his regular hourly rate. 106 Ltd. v. Commissioner, 136 T.C. at 80 (citing Countryside Ltd. P'ship v. Commissioner, 132 T.C. 347, 352-355 (2009)). There is no bright-line test for determining whether an adviser is a promoter. See Am. Boat Co. v. United States,

**[\*80]** 583 F.3d 471, 483 (7th Cir. 2009). We must also consider a taxpayer's right to structure his affairs in a way that minimizes tax and to seek tax advice to accomplish that result. The reasonable cause defense does not require the taxpayer to correctly anticipate the legal consequences that the Court will attach to the underlying facts of the transaction. Southgate Master Fund, 659 F.3d at 494.

We find that Mr. Tucker is not liable for the section 6662 penalty on the basis of his reliance on Mr. Schorr of KPMG. Mr. Tucker had a long-term relationship with both KPMG and Mr. Schorr, whom he viewed as a friend. Mr. Schorr introduced and recommended Mr. Speiss. KPMG had prepared petitioners' returns for 15 years without audit. Mr. Tucker had recommended Mr. Schorr to manage the WR executive program when it was created. Mr. Tucker did not solicit or initiate the contemplation of a tax strategy. Mr. Tucker believed that KPMG was offering its services as part of the WR executive program, which Waddell & Reed established to ensure that Waddell & Reed's executives were in compliance with tax law. Mr. Tucker had informed KPMG that he did not want to engage in a transaction that would subject him to IRS scrutiny because of concern for his professional reputation and career and the potential impact on Waddell & Reed's reputation as its CEO. After the issuance of Notice 2000-44, supra, Mr. Tucker was adamantly against participating in such a transaction. KPMG

[*81] repeatedly assured Mr. Tucker that Notice 2000-44, supra, did not apply to the FX transaction. Mr. Tucker believed that KPMG would protect his interests as KPMG had done when it terminated the short options strategy in response to Notice 2000-44, supra. Mr. Tucker believed that KPMG would not recommend an abusive tax shelter, and KPMG's withdrawal of the short options strategy after the issuance of Notice 2000-44, supra, confirmed this. He testified that KPMG's withdrawal of the short options strategy "made me feel better." Accordingly, when KPMG recommended the FX transaction, Mr. Tucker believed it was a legitimate tax planning solution. Because of his past experiences, Mr. Tucker did not expect that KPMG would recommend an abusive tax shelter. KPMG offered the FX transaction to only a limited number of individuals, three Waddell & Reed executives including Mr. Tucker. Mr. Tucker viewed KPMG's actions with respect to the FX transaction as an integral part of KPMG's normal tax planning advice on the basis of his longstanding relationship with KPMG, KPMG's role in the WR executive program, and his representations to KPMG that he did not want to engage in a tax strategy that could jeopardize Waddell & Reed's or his own reputation within the financial services industry. In fact, Waddell & Reed engaged KPMG to assist its senior executives in financial and tax planning in part to protect Waddell & Reed's reputation in the financial services industry. At

[*82] KPMG's recommendation, Mr. Tucker made $4 million in investments separate from the FX transaction to protect himself from IRS penalties.

At the time of the FX transaction KPMG was one of the largest accounting firms in the United States. Mr. Tucker viewed Mr. Schorr as a preeminent person for coordinating tax return compliance and tax and financial planning. Mr. Tucker believes KPMG misled him. He was forced to resign as CEO of Waddell & Reed and is no longer employable in the financial services industry. In the end, Mr. Tucker lost his position at Waddell & Reed because of his participation in the FX transaction and received a large settlement from KPMG for his lost future compensation. We note that in our order dated August 24, 2015, we found that Mr. Tucker's representations in his arbitration proceeding against KPMG support his assertion that he relied on the advice he received from KPMG in good faith. Because of Mr. Tucker's long relationship with Mr. Schorr, he was less likely to question KPMG's advice. While Mr. Tucker was motivated to reduce his 2000 income tax liability, he consistently represented to KPMG that he did not want to put his own reputation or career on the line as a result of a tax scheme. When KPMG recommended the FX transaction, Mr. Tucker believed in good faith that it was not abusive. Accordingly, we find that the section 6662 penalty is not applicable.

[*83] Mr. Schorr was a competent tax professional and had access to all necessary and accurate information about the FX transaction through his employment with KPMG. Mr. Schorr did not have a financial interest in the FX transaction as a tax shelter promoter would. While KPMG increased its fee above its initial fee, Mr. Schorr did not financially benefit from the increase. Mr. Tucker knew that Mr. Speiss at KPMG created the FX transaction as a customized tax solution to mitigate his 2000 income tax. Yet he did not understand that Mr. Speiss' involvement created an inherent conflict of interest with his longstanding relationship with Mr. Schorr and KPMG as his return preparer. Mr. Schorr also credibly testified that he did not believe Mr. Speiss' involvement created a conflict of interest. Further KPMG indicated to Mr. Tucker that Brown & Wood could provide independent legal advice with respect to the FX transaction. Mr. Tucker did not view KPMG as the promoter of a tax shelter for a number of reasons including his longstanding relationship with KPMG, KPMG's role in the WR executive program, and his statements to KPMG that he did not want to engage in a tax strategy that could jeopardize Waddell & Reed's or his own reputation within the financial services industry. He considered his main contact at KPMG, Mr. Schorr, to be a friend who would look out for his best interests. Mr. Tucker believed that KPMG would protect his interests as it had done when it terminated

[*84] the short options strategy. KPMG withdrew the short options strategy as abusive, and Mr. Tucker believed that KPMG would not recommend another potentially abusive transaction. Mr. Tucker credibly testified that KPMG's withdrawal of the short options strategy strengthened his trust in KPMG and his decades-old relationship with Mr. Schorr.

We place little weight on Mr. Tucker's failure to review certain documents relating to the FX transaction. As a senior executive, Mr. Tucker depended heavily on his personal assistant. We do not view Mr. Tucker's following his normal practices when dealing with his taxes as a failure of good faith or reasonable diligence. As a senior executive, Mr. Tucker had a management style of delegating to people whom he trusted. Having his administrative assistant open and read emails relating to the FX transaction was consistent with Mr. Tucker's normal business practice. Likewise we do not find the fact that Mr. Tucker did not read Notice 2000-44, supra, himself to preclude a finding of reasonable reliance on his adviser. Respondent argues that Mr. Tucker should have read Notice 2000-44, supra.[13] Mr. Tucker, who had experience with insurance tax matters in the early part of his career, left the tax field in 1984 and focused entirely on the

---

[13]Lehman Brothers' new account forms, which Mr. Tucker did not read, also mentioned Notice 2000-44, 2000-2 C.B. 255.

[*85] financial services industry. Mr. Tucker relied on KPMG because he believed that he would not understand the technical tax implications of the FX transaction. Despite his background, C.P.A. license, and law degree, Mr. Tucker had little understanding of the complicated tax issues involved in the FX transaction.

We do not base our finding of Mr. Tucker's reasonable cause and good faith on the Brown & Wood opinions. Mr. Tucker did not receive at least one of the Brown & Wood opinions before petitioners filed their 2000 joint return, did not read either opinion, and had limited direct communication with Brown & Wood attorneys. There is no evidence that Mr. Tucker directly paid any fees to Brown & Wood for the opinions. Moreover, the promoter group provided drafts of the opinions to Brown & Wood. The reasonable cause defense depends on the particular facts and circumstances of each case. In this case, we find that petitioners have established that they met the requirements of the reasonable cause defense and find that they are not liable for the section 6662 penalty.[14] Mr. Tucker made a sufficient good-faith effort to assess his 2000 income tax and reasonably

[14]Respondent argues that Mr. Tucker's statements in the arbitration proceeding against KPMG are admissions that prevent him from establishing reasonable cause here. We disagree, as we held in our order dated August 24, 2015, denying respondent's motion for summary judgment.

**[*86]** relied on Mr. Schorr's professional advice. To find otherwise would require taxpayers to challenge their attorneys, seek second opinions, or try to independently monitor their advisers on the complex provisions of the Code.

In reaching our holdings herein, we have considered all arguments made, and to the extent not mentioned, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered for respondent on the deficiency and for petitioners on the penalty</u>.